(No. 18507.— ▮▮▮▮▮▮▮▮▮▮▮)
THE NORTHERN TRUST COMPANY, Trustee, *vs.* JOHN R.
THOMPSON *et al.*—(THE NORTHERN TRUST COMPANY,
Trustee, *et al.* Plaintiffs in Error, *vs.* WALLACE R. CON-
DICT *et al.* Defendants in Error.)

*Opinion filed June 19, 1929—Rehearing denied October 14, 1929*

138

JOHN J. HEALY, MAYER, MEYER, AUSTRIAN & PLATT, OWEN RALL, and ROSWELL B. MASON, guardian *ad litem*, (HENRY RUSSELL PLATT, and M. PAUL NOYES, of counsel,) for plaintiffs in error.

MCNAB, HOLMES & LONG, and MATTHIAS CONCANNON, for defendants in error.

Mr. COMMISSIONER CROW reported this opinion:

The Northern Trust Company, as trustee of the property involved under an indenture of trust, filed a bill in chancery in the circuit court of Cook county seeking the aid and direction of the court in the execution of the trust. The specific question presented was whether the trustee should execute a contract with John R. Thompson authorizing him to remove a six-story brick building about thirty-five years old on the leased premises and replace it with one of not less than twelve stories, modern in every respect and in harmony with other buildings in an active business center of Chicago, at an increased annual rental of $5000 for the remainder of the term. Answers were filed by nearly all of the beneficiaries under the trust instrument, most of them admitting the averments of the bill and consenting to a decree as prayed. The guardian *ad litem* filed an answer for the infant defendants and admitted that the relief sought by complainant was beneficial to the infants and asked that it be granted. The cause was

heard upon the evidence in open court, and a decree was entered authorizing the construction of the building as planned under a compromise agreement appearing in the record. Wallace R. Condict and Lucy Smith, two of the beneficiaries, appealed to the Appellate Court, which reversed the decree of the circuit court and remanded the cause, with directions to dismiss the bill. John R. Thompson died while the cause was pending in the Appellate Court and his executors were made parties in his stead. To review the judgment of the Appellate Court *certiorari* was allowed.

The pleadings, consisting of the bill, its amendments, the answers and cross-bills and the decree, occupy 118 pages of the abstract and the evidence 185 pages. There is very little conflict in the evidence except as to opinions concerning matters that are not controlling upon any material question involved. The determining facts are stated in the bill and exhibits as abridged.

The bill avers that on March 18, 1889, Frederick Haskell and Caroline E. Haskell, his wife, leased to Herman H. Kohlsaat, Clarence I. Peck and Walter L. Peck the premises described, together with a ten-inch strip, designated as the Haskell property, for a term of ninety-nine years, commencing April 1, 1889, at an annual rental of $30,000. John R. Thompson is the owner of the leasehold estate in the Haskell property and of the building located thereon. On July 7, 1892, Mrs. Haskell delivered to complainant a trust indenture of that date conveying the Haskell premises, and on April 15, 1896, a supplemental trust indenture conveying upon the same trusts a ten-inch strip of ground demised by the additional lease of April 8, 1896. The pertinent provisions of the trust instruments are: Caroline Haskell grants, bargains, sells, conveys and sets over to the trustee the Haskell property, excepting the building and improvements thereon but including in the conveyance and assignment a certain lease of said premises now owned by

the party of the first part, demising the real estate for ninety-nine years from April 1, 1889, to have and to hold the same, with all the privileges and appurtenances belonging thereto, to the party of the second part, its successors and assigns, to its and their own use forever, upon the following express trusts: First, to collect the rents of the property at the times and in the manner provided in the lease, and, after deducting the reasonable charges and expenses of the trustee, to pay over the net income, as received, to Mrs. Haskell during her life, and after her death to pay over, divide and distribute one-sixth thereof to Louisa Condict during her life, and after her death, and up to the time of the final sale and distribution of the proceeds of said property as hereinafter provided, to the lawful heirs of Louisa Condict; another one-sixth thereof, in like manner, to Lucy Smith during her life and upon her death to her lawful heirs, and the remainder, in like manner, to sundry persons named or their lawful heirs, in varying proportions as specified. At the expiration of twenty-one years after the death of the last survivor of Mrs. Haskell, Louisa Condict and her two children, Lucy Smith and her two children, Jennie Porter and her three children and Edith Jones, the trustee is directed to grant, bargain, sell and convey the real estate and leasehold interest at the best price obtainable and divide and distribute the net proceeds of the sale, one-sixth among the lawful heirs of Louisa Condict, one-sixth among the lawful heirs of Lucy Smith, five twenty-fourths among the lawful heirs of Jennie Porter, and the remainder thereof, in varying proportions specified, to other parties named if then living, and if not, among their lawful heirs, respectively. The final clauses of the trust instrument are: "It is expressly agreed and made a part hereof that out of the trust funds and property the trustee shall from time to time be allowed and paid a fair and reasonable compensation for all its services hereunder, and shall be repaid all sums by it justly or necessarily expended in or about

the protection and management of the trust property or in or about the performance of the trusts hereof, including charges and compensation of all such agents, solicitors or attorneys, as in the judgment of the trustee shall at any time be needed about or concerning the trust property; and further, that in the performance of the trusts hereunder the trustee shall be held only to fair and reasonable diligence and discretion. It is expressly agreed and provided that if for any reason the ninety-nine-year lease above referred to should become forfeited or at an end, then and in that case the said trustee shall have and is hereby given full power to manage, improve, control, lease, protect and care for said trust estate and property according to its best judgment and discretion in all things but for the purposes herein provided for."

The bill further alleges that the complainant trust company is the owner in fee of the Haskell real estate and since July 7, 1892, has been in charge thereof, collecting the rent and distributing it, first to Mrs. Haskell, who died April 21, 1900, and thereafter to her beneficiaries; that the six-story brick building on the Haskell property is about thirty-five years old, in bad repair, practically worthless and wholly inadequate to the uses of the locality; that it is to the best interests of the trust estate to remove the building and replace it with a modern structure; that Thompson is also the lessee under long-term ground leases of the adjoining premises on the west, designated as the Freer property, and of the adjoining parcel at the northwest corner of Dearborn and Madison streets, designated as the Field property; that Thompson desires to remove the Haskell building and to construct upon the Haskell property and the adjoining lands a first-class, modern fireproof building not less than twelve stories in height; that there is no express provision in the Haskell lease in terms authorizing the removal of the building or expressly authorizing the use of a building on the Haskell premises as part of

a building thereon and other premises adjacent thereto; that Thompson claims the right under the Haskell lease to remove the Haskell building and replace it with a building of greater height and value which can be connected with buildings upon the adjacent premises and operated as a single building; that complainant is in doubt as to the right of Thompson to remove it or otherwise carry out his plans for a single building without its consent, and it is in doubt as to its right to consent to any modification or enlargement of the term of the lease; that as a result of these divergent views and in compromise of their differences, complainant and Thompson, by Platt as his attorney, on December 16, 1925, entered into a supplemental lease or compromise agreement, subject to the court's approval and confirmation. A copy of this agreement was made a part of the bill, and its provisions in substance are:

After reciting the execution and delivery of the lease and the adjoining leaseholds, the desire to improve the same with a modern fireproof building so constructed as to be capable of use as a separate building as to each parcel, the claims of Thompson as to his rights in that regard, the trustee's doubt as to the rights so claimed, and the desire of the parties to adjust their differences in an amicable manner and to their mutual advantage, the trustee agrees that Thompson may remove the Haskell building, provided he shall first procure to be executed and delivered to the trustee an undertaking, in form to be approved by it, binding Thompson, his heirs, legal representatives and assigns, within a reasonable time after demolishing the building, to erect and complete upon the premises a building as later described in the instrument, free from any mechanics' liens or possibility thereof; that the trustee will join with Thompson in executing proper party-wall agreements, in the general form in common use in connection with the erection of party-walls in the down-town district of Chicago, providing for the sinking of caissons to bed-rock or hardpan and the

erecting of proper steel structural members thereon, standing one-half on the Haskell premises and one-half on the adjoining lands; that such building may be so constructed as to be used in conjunction with a new building on the adjoining premises, provided that such construction shall be so arranged that the building on the Haskell premises can be equipped, without structural alteration, with proper elevators, stairways and apparatus for the supply of light and heat and with proper plumbing and service appliances, so that it shall be capable of separation and use and operation as a separate building, without structural alteration, by the installation of enclosing walls between floors, adequately supported by the structural members placed along the lot lines; that after the erection of any such new building the same may be removed by the lessee and another building of similar character and of at least equal value may be erected within two years thereafter, provided the lessee shall, before such removal, deposit with some bank or trust company satisfactory to the trustee, marketable securities approved by the trustee having a cash market value equal to the fair cash value of the building to be removed, which securities shall be held as security for the performance of the conditions of the lease until the completion of such new building, free from mechanics' or other liens of like nature or the possibility thereof. In consideration of the trustee's agreement Thompson agrees that for the balance of the term he will pay an annual rent of $35,000 instead of $30,000, commencing with the removal of the present building; that at such time as he may elect within the term of the lease he will remove the present building and replace it with a first-class, modern fireproof building not less than twelve stories in height, which, if covering adjoining property, will be so constructed as to be capable of independent use as a separate unit without structural alteration; that if at any time during the term of the lease he shall alter, improve or enlarge the building then on the

premises, he will, previous thereto, give the trustee security satisfactory to it against the accrual of any mechanics' liens or possibility thereof; that he will at all times after the erection of the new building maintain it, or any building substituted therefor, in good condition and repair and insured as provided in the lease, except that the amount of insurance shall be not less than seventy per cent of the fair insurable value of the building or portion of the building on the Haskell premises above the foundations; that before the present building shall be torn down he will furnish to the trustee the plans and specifications of the proposed new building and will construct it in substantial accordance therewith; that in case of any proposed structural alterations of the new building to be presently erected, or of subsequently replacing it with another building, he will in like manner first submit plans and specifications to the trustee, and that he will in all respects perform all the obligations in the lease except as modified by this agreement and will perform all his covenants herein. Except as modified, all the terms and conditions of the lease of March 18, 1889, shall remain in full force and effect for the entire balance of the term; that all covenants and agreements herein shall be binding upon and inure to the benefit of the respective successors, legal representatives, heirs and assigns of the parties; that any covenant herein contained on the part of Thompson may be performed by any sub-lessee with like effect as if personally performed by Thompson; that the agreement is executed by the trustee in pursuance of every right, power and discretion it has under the trust instrument but that it is unwilling to warrant or represent the extent of its powers in that regard, and that the agreement shall not become binding upon the trustee or the trust estate until the power and right of the trustee or the trust estate to make the agreement, and thereby bind the trust estate, shall have been established and the agreement confirmed and ratified by the decree of a court of competent

chancery jurisdiction in proper proceedings, which the trustee agrees forthwith to institute for that purpose, and that Thompson's covenants, including the payment of the increased rental, shall not become operative until such decree shall have been entered.

The bill avers that in addition to the increased rent Thompson has agreed to pay the costs of the suit and the fees of the trustee and its solicitor; that the building which he proposes to erect upon the Haskell property shall be thoroughly modern, of fireproof construction and of a value far in excess of the present worthless building, and when completed will materially add to the security of the lease, and will constitute at the end of the term a value to the then owners of the fee greatly in excess of the value of the property as now improved; that in the judgment of complainant the proposed settlement of its controversy with Thompson is fair and equitable and for the best interests of the trust estate and will result in substantial financial advantage to the trust estate and the beneficiaries, but as complainant is acting for the benefit of numerous beneficiaries widely scattered and difficult of access, and is doubtful of its right to act without first being advised by a court of chancery, it deems it expedient to apply to the court for such advice. The bill prays that the court by its decree determine and state whether complainant shall accept and carry out, or reject, the proposed offer of settlement and compromise made by Thompson by delivering and finally confirming the supplemental lease, and also that complainant may be fully instructed and advised as to its rights, duties and powers in the premises, and for general relief.

Defendants in error by their joint and several answers admitted the execution and delivery of the Haskell lease and the trust indenture of July 7, 1892, and that the same were in full force and effect, but prayed for strict proof as to whether Thompson was the owner of the lease; admitted that complainant is the owner in fee of the Haskell

premises and that the six-story brick building now located thereon was erected about thirty-five years ago, but denied that it is practically worthless or inadequate to the uses of the locality or that it is to the best interests of the trust estate to remove that building and replace it with a modern structure.

The decree finds that the proposed new building to be erected upon the Haskell property is to be a thoroughly modern fireproof building of a value far in excess of the present building; that the building, when completed, will materially add to the security of the lease and the premises will be of a value greatly in excess of the value as now improved; that the proposed settlement, under all the circumstances, is fair and equitable and will result in substantial financial advantage to the trust estate and the beneficiaries, and that the defendants are the only persons or represent all classes of persons who have any interest, vested or otherwise, in the trust estate or the leasehold premises. The court decreed that the compromise agreement and the accepted offer of Platt, acting for Thompson, are fair and equitable and for the best interests of the trust estate and of all present and future beneficiaries thereunder and of the present and future owners of the fee; that under the proper interpretation of the trust indenture complainant had, and now has, the right and power to make the agreement and to accept Platt's offer, which are approved and confirmed in all respects and declared binding on the trust estate and all persons now or hereafter interested therein, and the trustee is directed immediately to deliver the agreement to Thompson and to carry out the same in all respects, and all its actions in connection with the agreement and the institution and prosecution of the suit are approved.

While the fact is not controlling, it appears that none of the beneficiaries except Wallace R. Condict, and Lucy Smith represented by Condict, oppose the offer of Thompson and its acceptance by the trustee. The trust will termi-

nate twenty-one years after the death of the last survivor of designated persons, including Condict and Mrs. Smith. They together are beneficiaries of one-fourth of the income, Jessie Condict Lee and Jennie Porter have one-fourth, and the remaining half is owned by thirty-three beneficiaries residing in the United States, Canada and Europe. Beneficiaries having an interest in $16,567 of the income consented to the decree. The guardian *ad litem* approved the agreement. In addition to Condict and Mrs. Smith are those not answering, and therefore defaulted, and neither positively assenting nor dissenting. Edith Jones, now thirty-seven years old, is the youngest, and Mrs. Smith, eighty-two years of age, is the oldest of the living beneficiaries. Condict was representing Mrs. Smith in the negotiations to modify the lease. This fact was established by her letter to the trustee. He testified that negotiations for the modification of the Haskell lease were first begun about 1916 and continued intermittently until the execution of the agreement of December 16, 1925, with Thompson. In 1919 the first definite offer was made, at which time Condict wrote a letter to the trustee dated June 16, 1919, about a month before Thompson acquired the property, stating: "Referring to our conversation of this date regarding possible changes in the Haskell lease, I should think that an increase in the rental of from ten per cent to fifteen per cent would be all we would have a moral right to expect. Of course, if you can get more there is no objection to taking it, but, with the other advantages which will accrue, I for one would be glad to take an increase of ten per cent to fifteen per cent." He testified that when he wrote the letter he was expressing his honest views in the matter; that at that time he recognized there was some moral issue in the situation; that it was the fair and square thing for him to do; that the "other advantages" referred to in his letter would come in the additional security resulting from the erection of a new and modern fireproof building, and that

the only thing he ever discussed with the trustee was increased rental to be paid and Thompson's right to tear down the building. Under cross-examination as to his express approval of the compromise agreement previous to the filing of the bill, he admitted that in October, 1925, he asked Miller, the vice-president of the Northern Trust Company, to try to get a rental increase of $6000, as it looked like more and would figure easier in dividing the income into sixths or twelfths; that if Miller could not get more than $5000, and all the others agreed, it would be satisfactory to him, and he told Miller that so far as he was concerned he would not openly and actively oppose the arrangement going through. Miller's testimony as to the conversation was to the same effect. He expressed to Condict the opinion that there was no chance of getting $6000 but said he would try, and Condict said: "All right; you try for $6000, and if you can't get $6000, $5000 a year for this modification that you propose is all right with me if it is with the rest." At that conversation Condict asked Miller to be sure to make Thompson pay the expenses, including the fees of the trustee's solicitor, and Miller agreed to do so. That arrangement was made part of the agreement. Miller further testified that not until January, 1926, after the filing of the bill, did Condict express any opposition to the agreement, and that the only reason he then assigned for opposing it was a personal difference with his brother-in-law, who is associated with counsel for the trustee in this suit.

Mark Levy, who the evidence shows has a wide experience, particularly in the sale and long-term leasing of downtown property in Chicago, was called as a witness by Condict. He fixed the fair rental value of the Haskell property on a sixty-two-year lease, granting the privilege to the lessee of developing the property to its highest and best use upon giving adequate security for the cost of the new building, at $81,320 per year net, the lessee to pay taxes

and other charges. He testified that, assuming the present building was to remain for the unexpired term of sixty-two years, the rental value of the Haskell property put to that particular use and no other would be $69,000 per year net. The difference between these rentals is more than $12,000, and the additional rent of $5000 payable by Thompson under the agreement is more than forty per cent of the increase in the rental value for the Haskell leasehold, if properly improved, as fixed by Condict's own witness, and more than the fifteen per cent increase in the annual rent of $30,000, which Condict fixed as the maximum of what "he had any moral right to expect." The general taxes on the Haskell property at the time of the trial were over $35,700 per year.

All interests in the Haskell property and income from it, will be unimpaired by the proposed reconstruction of the building. If a twenty-five story hotel building, at a cost of $4,700,000, shall be constructed on the three properties under a sub-lease from Thompson, mentioned as a possible improvement, the beneficiaries of the Haskell trust cannot be injured. The improvement contributes to the income and adds greatly to the value of the *corpus* of the trust property. It is located in the busiest center of the city, as testified to by some of the witnesses. There is no provision in the lease restricting the right of the lessee to erect a building of any size or of any cost or value or for any purpose. The right to occupy the land, under the terms of the lease, without restriction as to the character of building for the long period necessarily implies the right to replace the old with a new and better building so long, only, as the security of the lessor is not impaired. *Hawes* v. *Favor,* 161 Ill. 440.

In the case just cited the lease contained covenants that the dwelling house on the lot should be held and taken as part and parcel of the realty and in no case to be removed therefrom, and that it and all buildings erected on the lot should be taken and held to be permanent improvements

and part and parcel of the realty and in no case should be removed therefrom. There was also a covenant that the lessee should keep the premises in good repair during the term. Construing the negative covenants and denying their effect as a bar to the relief sought, (the construction of new buildings,) it was said: "It is insisted by appellants that under the covenant that any building on the premises then or thereafter erected should be a part of the realty and a permanent improvement, and be in no case removed therefrom, and be kept in repair, etc., the lessee was bound to keep and maintain the building just as she found it when the lease was made. In construing these covenants, as in the construction of every contract, the circumstances and conditions surrounding the parties and property must be taken into consideration. The manifest object of the parties in putting these covenants in the lease was to protect the lessor against loss resulting from permitting the property to go into decay or to be removed from the premises. It can scarcely be seriously contended that it was expected that a building of the description of the one on the lots in 1874 should be maintained during the whole period of ninety-five years. In fact, the evidence shows that at the time the improvements were made thereon they were necessary to prevent its becoming unsafe as a residence and falling into decay. That injury or danger of loss to the lessor was occasioned by the change is not pretended. More than double the security which the lessor had in the old building was furnished by the improvements made on it. There was no violation of the covenant in the lease by pulling down or destroying or removing the house." There are no negative covenants in the lease in this case.

In *Denegre* v. *Walker,* 214 Ill. 113, the question was the power of a court of equity to authorize trustees to make a ninety-nine year lease of trust property where the adult parties in interest consented. There were three infants having contingent interests in the trust. The adults filed an-

swers approving a long-term lease. The buildings on the property were in a bad state of repair, without modern conveniences, the rents diminishing and tenants hard to get. It was charged in the bill that the building was unsuitable to its situation and should be replaced by a modern structure. The testator left $500,000 with which to improve the real estate as the trustees should see fit, but $600,000 was necessary to construct a suitable building. The trustees deemed it unwise to expend the money on the property and asked that it be leased for ninety-nine years or longer, securing therefrom an income of $25,000 or $30,000 per year instead of $18,000, the then rental. They entertained doubts as to their authority, under the terms of the will, to lease the property and filed their bill seeking the advice of the court in that respect. The chancellor entered a decree authorizing the trustees to lease the property for a term of ninety-nine years for not less than $25,000 per year. Approving the decree this court said: "A court of chancery has to some extent a general supervision over trust estates and may direct such a disposition as in its discretion seems beneficial to all parties interested, even going so far as to order the sale of the trust estate and a re-investment of the proceeds without authority being given by the will, if the conditions are such that it is manifestly in the interest of the trust estate.—*Hale* v. *Hale,* 146 Ill. 227; *Gavin* v. *Curtin,* 171 id. 640." The principle of that decision had been announced in *Marsh* v. *Reed,* 184 Ill. 263. The chancellor ordered the trustees to make a ninety-nine year lease, in direct contravention of the provision of the will restricting the terms of leases to ten years. Affirming the decree it was said: "The bill did not ask for interference with, nor does the decree in any manner interfere with, the design of the donor as to the devolution of the title to the trust property. The decree leaves the title to the property in the trustee, who remains charged with the duty to convey it in exact obedience to the wishes of the creator of the trust.

The donor clothed the trustee with authority to rent the property and to collect the rents therefrom during the continuation of the trust, and in so doing placed a limitation upon the duration of any lease of the property to be made by the trustee. The effect of the decree is to enlarge the powers of the trustee in this respect, leaving the subject matter of the trust in all other respects unimpaired. In other words, the decree does not defeat the trust but was entered upon the theory its provisions were necessary to carry into execution the design of the donor." The decree in the case at bar leaves the title where the founder of the trust placed it, and it is available for all purposes of the trust.

In *Freeman's Estate,* 181 Pa. St. 445, the facts were very similar to those in the case at bar. The orphans court approved a lease for fifty years made by the trustee under a will. The lease was treated as amounting to a sale, which required the consent of the adult beneficiaries under the requirements of the will. It was also contended that the case was within the provisions of a statute authorizing the orphans court to decree a sale of property held in trust where one or more persons required to consent unreasonably withheld consent. Holding that the lease did not contravene the express directions of the testator but supplemented the authority he gave by resort to the power of the court to meet circumstances not anticipated, and therefore not provided for by him, the Supreme Court said: "The main value of the property is in the land. The buildings are only a survival of the private residences to which the neighborhood was originally devoted, temporarily adapted for business but falling far short of the kind of improvement that the present uses of the neighborhood demand. The rental of the property in its present condition is an inadequate percentage on its assessed value for taxation, and the latter is constantly increasing. It is admitted that the proposed lease will at once double the net revenue from the property, with an increase in the future in actual amount

as well as in indemnity against the increase in taxation; and the property will revert at the end of the term, improved by the erection of a building adapted to its most modern needs, at a cost entirely defrayed by the lessee, of more than one-half of the amount of the highest present valuation of the whole property. This plan has the active support of the owners of five-sixths of the property and has been approved by the judgment of the trustee and the court below."

Where a demise is made for a great number of years—say one hundred or two hundred—for a fair rental value of the premises, it must be presumed that the parties intended that the tenant for years should have well-nigh unrestricted use of the premises, provided he does not reduce their rental value, for in such a case the reversion, independent of the rent, is of mere nominal value. *Klie* v. *VonBroock,* 56 N. J. Eq. 18.

No case in this State has been cited and no principle announced by any authoritative source that requires a lessee under a long-term lease to refrain from improving the subject of the lease until absolute necessity requires it. To forbid improvement is to require that the subject of the lease shall remain until it has fallen into a state of desuetude, and therefore to deny the right to devote the property to the highest and best use to which it may be suited. It is not suggested how or in what manner the rights of Condict, or of those in his class in their relation to the property, can be adversely affected by the new building under the long-term lease. Their right to possession of the lot, and the building on it, is not affected, for no such right is vested in them. Their sole right under the terms of the will is in their portion of the income, enhanced by the compromise agreement at Condict's insistence though not as much as he demanded. Under the terms of the trust the fee will not pass to any of the present beneficiaries. At the expiration of twenty-one years after the death of the last

survivor of Mrs. Haskell and of her descendants named in the trust instrument, the trustee is directed to sell and convey the leasehold interest and distribute the net proceeds of the sale as directed. It is not contended that security for the income of the ultimate beneficiaries is imperiled by the new building. It is manifest that it is not. The objections go only to the removal of the old building and the erection of a new building as provided for in the agreement. No part of the cost of the new building is imposed on the defendants in error. Every contingency that might impose expense upon any beneficiary of the trust is carefully guarded against. Condict insisted that Thompson be required to pay the costs and expenses of this litigation, including the fees of the trustee's solicitors. At that time he did not assert opposition to the proceeding. No precaution for the protection of the beneficiaries has been omitted. Under the agreement Thompson is required, before demolishing the building, to furnish an undertaking, to be approved by the trustee, binding him and his personal and legal representatives and assigns within a reasonable time to erect and complete the new building. It is apparent that the trustee, under its strict duty as trustee, must see that Thompson under his undertaking, and his representatives standing in his stead, comply with all the terms of the agreement before exercising the right to tear down the old and construct the new building.

Defendants in error contend that there is now no necessity for modifying or enlarging the terms of the trust. The argument, in effect, is that it is not indispensable to the preservation of the trust from destruction or to carry out the main intention of the creator of the trust, and the trustee cannot authorize such alterations merely to benefit the interests of those who are beneficiaries of the trust. The contention overlooks the fact that the question presented is not one of changing the trust or breaking in on the trust. The question is one relating to its administration. The

question being one which relates merely to the better or more judicious mode of managing and controlling the subject matter of the trust in order that the design and wishes of the donor may be more completely accomplished, the stringent rule which properly obtains when the application is to divest the trustee of the title to the property which is the subject matter of the trust and vest such title in direct opposition to the will of the donor ought not to be given full application. (*Marsh* v. *Reed, supra; Denegre* v. *Walker, supra.*) The integrity of the trust is untouched by the compromise agreement. No rights of any of the *cestuis que trustent* are infringed by it. By carrying out the agreement the trust will, in fact, be bettered. As the court said in *Freeman's case, supra,* the increased income is an indemnity against increased taxation.

It is further objected that the evidence must show a compromise beneficial to the trust estate. The trust estate is not limited to the interest the present objectors have or may have in the funds to be distributed. Defendants in error seem to complain that $5000 per annum increase for the *cestuis que trustent* is not enough. They say the privilege conferred on Thompson under the compromise agreement is worth far more than the amount to be paid. If, as they contend, the compromise is illegal, it would not be more legal if the increased amount were $10,000 instead of $5000. But the trustee and Thompson were not reckoning with the present beneficiaries, alone. The trust was created for others. Their rights and those of the present beneficiaries were further protected by seeking the advice of chancery, showing utmost good faith in dealing with the important matter affecting so many interests. An increase of $5000 per year for sixty years, practically the remainder of the term, will amount to $300,000.

Other objections to the validity of the lease are made and are not more meritorious than those noticed. It may be observed, however, that it is argued that the trustee has

become personally interested in the transaction to the extent of the sum of a $2500 fee which is to be paid to it by Thompson upon approval of the compromise agreement by the court and should not receive the approval of the court. But that was an arrangement in the interest of all beneficiaries, present and prospective. The trustee was not required to incur personal costs in the protection of the rights of the beneficiaries. It does not invalidate the compromise agreement.

It is contended that section 50 of the Chancery act, as amended in 1911, prevents a court of chancery from granting the relief allowed by the decree in this case. The relief sought and granted was advice, upon the application of the trustee, whether it should make a contract with the lessee authorizing him to tear down an old building on the leased premises and replace it with a modern building more suitable to its environment, of more profit and of greater value to the trust estate. Before this amendment was incorporated in the section this court had authorized the relief allowed in this case. (*Hawes* v. *Favor, supra; Marsh* v. *Reed, supra; Denegre* v. *Walker, supra.*) The amendment invests chancery courts with no new power in this respect but confirms a power existing and exercised before it was enacted. The contention is made the basis for an extended argument as to the constitutionality of the amendment as applied to this case, but it is immaterial.

It is contended that the rule in *Shelley's case* is applicable in this controversy. The rule is applicable only where a freehold is conveyed. There is no such conveyance in this case. The trust instrument executed by Mrs. Haskell conveys the real estate for ninety-nine years to the trustee upon certain trusts. At the expiration of twenty-one years after the death of the last survivor of certain persons the trustee is directed to sell and convey the real estate and leasehold interests and distribute the proceeds to described persons *per stirpes*. The direction to sell and convey and to

distribute the proceeds of the sale operates as a conversion of the realty into money. This leaves no estate to which the rule can have any application.

It is also contended that the bill should have been dismissed for want of necessary parties. All necessary parties—that is, all persons having a present interest in the subject matter of the controversy and who would take a distributive share if distribution had been made at the commencement of the suit—were parties to the suit. Others who would take in the event of the death of those who were parties were represented by them. (*Green* v. *Grant*, 143 Ill. 61.) The trustee represents those having a contingent interest in the trust fund. (*Easton* v. *Hall*, 323 Ill. 397; *Longworth* v. *Duff*, 297 id. 479.) All present or contingent interests were properly represented and are bound by the decree.

In *Stephens* v. *Collison*, 274 Ill. 389, relied on by defendants in error and by the Appellate Court, the executors asked the circuit court for authority to settle a will contest. One of the parties interested objected to the settlement. The circuit court overruled his objections and ordered the settlement approved and conveyances made in accordance with the proposed terms of settlement. It was held that the court had no power or authority to disregard the terms of the trust created by the will and compel a party interested in the trust property to accept a compromise settlement against his interest where all the other parties are willing and desire the settlement, because the settlement destroyed the trust and the intention of the testator was entirely defeated. The effect of it was to "abrogate the will and vest title in the heirs and devisees according to the court's judgment of what is just and best for them." None of those circumstances are present in the case at bar. What has been done in this case is in furtherance of the trust and promotive of its purposes.

158

The decree of the circuit court was right. The judgment of the Appellate Court is reversed and the decree of the circuit court is affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Crow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Judgment of Appellate Court reversed.*
*Decree of circuit court affirmed.*