WARREN BOYNTON STATE BANK, Ex'r under the Will of E. Mae Wallbaum, Deceased, *et al.*, Plaintiffs and Counterdefendants-Appellees, v. WILLIAM DUKE WALLBAUM, *et al.*, Defendants and Counterplaintiffs-Appellants (Martha Adkins Wallbaum *et al.*, Defendants; Central Baptist Church, *et al.*, Counterdefendants).

Fourth District   No. 4—85—0560

Opinion filed April 21, 1986.—Rehearing denied June 13, 1986.

Burger, Fombelle, Baxter, Zachry & Rathbun, P.C., of Decatur (Norman J. Fombelle and James E. Zachry, of counsel), for appellants.

Barber, Segatto, Hoffee, Hines & Edwards, of Springfield (Henry R. Barber and Richard C. Edwards, of counsel), for appellees Warren Boynton State Bank and Leonard B. Stilwell II.

Robert A. Huffman, of Virginia, for appellees Mary Ann White and George William White.

William B. Wham, of Wham & Wham, of Centralia, for appellee Hudelson Baptist Children's Home.

JUSTICE MORTHLAND delivered the opinion of the court:

This is an appeal from a judgment of the circuit court ordering partition. The appeal is brought by various children and descendants of Ernest A. Wallbaum and William Conway Wallbaum. The appellees are the executor of the estate of Emma Mae Wallbaum, a sister of Ernest and William Conway; the guardians of a disabled adult, the surviving widow of a grandson of Emma's third brother Frederick C. Wallbaum; and the executor of the estate of Elaine Stilwell and Hudelson Baptist Children's Home, certain of the residuary devisees under the will of Emma Mae Wallbaum.

The basic facts are not in dispute. William Wallbaum during his life fathered four offspring by his three wives; Ernest A. in 1869, Frederick C. in 1871, Emma Mae in 1898, and William Conway in 1904. By various conveyances over the course of his life William deeded 561.03 acres to his son, Ernest, reserving a life estate in 361.03 acres; 579.25 acres to his son, Frederick, reserving a life estate in 319.50 acres; 208 acres to his third wife, Martha for her life, reserving also a life estate in himself, with remainder to the issue of that marriage their son William Conway; and 400 acres to his daughter, Emma Mae under certain conditions which will be developed more fully below.

The deed to Emma was executed by William on July 31, 1903. The instrument reserved a life estate in William in 400 acres and conveyed to Emma, a then 5-year-old child, a life estate. The portion of the deed in controversy further provides:

"And upon the death of said Emma Mae [*sic*] Wallbaum leaving children of her body her surviving, the above described real estate shall descend to such children Share and Share alike. The children of any deceased child, taking only the share which their parent would inherit if living. Upon the death of said Emma May [*sic*] Wallbaum leaving no such children her surviving the above described Real Estate shall descend to the heirs of said William Wallbaum, Share and Share alike. The children of any deceased child taking only the share which their parent would inherit if living."

William Wallbaum died testate at the age of 67 on January 9, 1905, leaving a will dated December 28, 1904. At his death, his four children Ernest, Frederick, Emma, and William Conway were his heirs at law. Ernest and Frederick were 35 and 33 years old, respectively, at the time of their father's death. Emma was 6 years old and William Conway was 3 months of age.

By his will, William devised all his property to his children and his third wife, Martha, in varying proportions. No devise was made of any interest in the 400 acres in question. The will did not contain a residuary clause.

Emma Mae Wallbaum died testate on March 6, 1984, having neither married nor borne children. Prior to her death all of her brothers had died. Each brother was survived by children. The executor of Emma's will made a claim that under the terms of the deed she was an owner in fee of a one-fourth interest in the 400-acre parcel which passed as part of her residuary estate to a friend and certain religious and charitable organizations. Certain descendants of William Wallbaum's sons maintained that upon Emma's death without issue, her estate in the land terminated and no interest passed under her will.

In construing the deed the court applied the general rule that heirs are to be determined upon the death of the testator unless the intention to refer to those who will be heirs at a period subsequent to the ancestor's death is plainly manifested. Finding no language in the will requiring or implying that an heir survive the life tenant, the court held that Emma had a one-fourth interest in the property and that interest passed under her will. From the order of partition this appeal is taken.

Defendants contend that in construing the deed the trial court applied the Rule in Shelley's Case and/or the Doctrine of Worthier Title in error. Defendants also argue that under the deed the grantor intended to create an alternative contingent remainder to take effect upon the failure of the prior contingent remainder which vested in a class consisting of the grantor's lineal descendants who actually survived the death of the life tenant. Because Emma necessarily could not survive herself, defendants claim the trial court erred in determining she had an interest in the property subsequent to her death.

■ The first two issues may be dealt with summarily. We note, at the outset, that the trial court made no reference to either the Rule in Shelley's Case or the Doctrine of Worthier Title in reaching its conclusion. The absence of any apparent reliance on either the Rule or the Doctrine would seem appropriate and consistent with the court's ruling, since we believe neither applies.

The Rule in Shelley's Case may be described briefly as follows:

> "If a life estate in land is conveyed or devised to A, and by the same conveyance or devise, a remainder in the same land is limited, mediately or immediately, to the heirs of A, or the heirs of A's body, and the life estate and remainder are of the same quality, then A has a remainder in fee simple or in fee tail." (L. Simes & A. Smith, The Law of Future Interests sec. 21, at 46 (2d ed. 1956).)

By the Rule's own terms it has no application to the present case. In order for the Rule to become operative, the same instrument which created the life estate must also covey a remainder to the heirs of the life tenant. Here, the deed did not "create" any interest in William Wallbaum; the grantor merely reserved a life estate for himself in land he already owned in fee simple. To be more precise, the Rule applies only to conveyances wherein the heirs named are heirs of a person to whom the life estate is conveyed but does not apply when they are heirs of a grantor.

■ So too, under the common law it was also impossible to create another kind of further interest in an *inter vivos* conveyance—a remainder in the heirs of the grantor. Known as the Doctrine of Worthier Title it remains in limited circumstances as a rule of construction and may be described by the following example:

> "Thus, if A, owning land in fee simple, conveyed to B for life or in fee tail, remainder to the heirs of A, the remainder was declared void, and A had a reversionary interest in fee simple." (L. Simes & A. Smith, The Law of Future Interests sec. 1601, at 491 (2d ed. 1956).)

It is not a positive rule of law but only a rule of construction and when it is clear from the language employed that the grantor intended to use the term "heirs" in other than its strict, technical sense, the Doctrine will not be allowed to defeat the intent of the drafter. The word "heirs" is a technical term which has a fixed legal meaning and refers to those persons who would be appointed by law to inherit an estate in the case of intestacy. When used in a deed the term will be given this legal effect unless the drafter uses inconsistent words showing a clear contrary intent, or to do so would defeat the obvious general intention of the drafter. (*Harris Trust & Savings Bank v. Jackson* (1952), 412 Ill. 261, 106 N.E.2d 188.) In examining this deed, and in particular the last sentence of the instrument, which provides for a substitutionary gift to the offspring of William's children, we are satisfied that the grantor was using the word "heirs" in its nontechnical sense to indicate a group or class of individuals comprised of his children. Absent compelling reasons to apply the rule and in the face of specific language in the deed rendering it susceptible of an alternate interpretation, we decline to adopt a construction which would render at least a portion of the conveyance void.

We thus turn to the question of survivorship; whether from the language of the deed Emma's interest in the property became indefeasible at her death and passed under her will or whether Emma's death extinguished her further interest in the land. Initially, we consider the estates which were created by the deed. The parties agree that at least four separate estates were created; two vested life estates followed by alternative contingent remainders. The parties differ, however, in their interpretation of whether, and under what conditions, these contingencies vest, if at all.

The parties have ably presented the case to us by way of briefs and argument. In support of their positions each has cited a significant number of cases which apply rules of construction to particular fact patterns. However, no party has cited to us a case in which the words of the particular devise or conveyance are identical to those present here. Neither has our research revealed any such case. As has often been said, while decisions in other cases may serve to guide the court with respect to the general rules concerning the construction of instruments, unless the cases examined be, in every respect, directly in point the decision will not control but at most will only be persuasive. *Hartwick v. Heberling* (1936), 364 Ill. 523, 4 N.E.2d 965.

The cardinal rule for construing an instrument is that the intention of the grantor be determined from the entire instrument and

that it is to be given effect unless contrary to public policy or established rules of law. (*Desmarteau v. Fortin* (1927), 326 Ill. 608, 158 N.E. 444.) In interpreting intent, like principles are applied to wills, deeds, and trusts. (*Storkan v. Ziska* (1950), 406 Ill. 259, 94 N.E.2d 185.) Intention is determined in two ways: (1) by ascertaining the actual meaning from the words used, to which all rules of construction must give way, and (2) by finding the presumed intention from application of rules of construction governing all cases in which the meaning is obscure, doubtful, or uncertain. (*Smith v. Shepard* (1939), 370 Ill. 491, 19 N.E.2d 368.) The presumed intention as fixed by rules is used, however, only where the actual intent cannot be ascertained, and if the intention of an instrument may be gathered from its language without reference to rules of construction there is not occasion to use the latter. (*Harris Trust & Savings Bank v. Jackson* (1952), 412 Ill. 261, 106 N.E.2d 188.) To state the matter otherwise, if the intention manifested in the form required by law is clear, the court will uphold it, even though a different result would be reached by rules of construction applying to specific provisions of the instrument. *Stagg v. Phenix* (1948), 401 Ill. 134, 81 N.E.2d 565.

■■ In our view the intent of the grantor in this case is clear. The language of the deed necessarily requires survivorship and the gift over upon failure of the first contingent remainder is limited only to those children of William who were alive at the time of the death of the life tenant. If we here apply any rule of construction in determining the intent of the grantor it is that no word or phrase in an instrument should be ignored and that no phrases or words are considered meaningless, repugnant, or surplusage. *Woods v. Seymour* (1932), 350 Ill. 493, 183 N.E. 458; *Dolley v. Powers* (1949), 404 Ill. 510, 89 N.E.2d 412.

The aspect of survivorship is clearly indicated in at least two portions of the deed. Consider first the estate created by the first contingent remainder. At the death of Emma, the real estate descended *per stirpes* to the children of her body *her surviving*. Assuming Emma had children during her lifetime who predeceased her, under the plain terms of the deed, the deceased children's estates took no interest in the land at her death. The first contingency, however, also provides for a substitutionary gift over to the children of any deceased child of Emma. While we need not consider whether a child of a predeceased child of Emma must survive Emma's death to take under the first contingency, it is clear from the logical scheme set up by the deed that should any child of Emma die before her, with or without having had children, the interest of that predeceased child is extinguished.

Any grandchildren of Emma, who might take under the substitutionary gift over take directly upon the death of Emma; not through the estate of the deceased parent.

Turning to the second contingent remainder, we ascertain an identical intent to limit any gift over upon failure of the first contingency to only those surviving children of the ancestor, William. Although the words employed by the grantor are slightly different than those used to create the first contingency, their meaning is logically indistinguishable.

By its strict terms in the event of the failure of the first contingent remainder upon the death of Emma the real estate "shall descend to the heirs of said William Wallbaum." We have already determined that the term "heirs" is used synonymously with "children." At Emma's death no children of William were alive. If the language of the gift over ended at this point, we would have no trouble concluding that each of the four children of William, alive or dead, took a one-fourth share of the property. However, the deed creates a substitutionary gift over to the offspring of deceased children of William under the following terms: "The children of any deceased child taking only the share which their parent would inherit *if living*" (Emphasis added.)

It is without doubt that the substitutionary gift over to the offspring of a deceased child of William became "vested" (although not in its feudal sense) in that child upon the death of the parent. Simply put, at the moment of their deaths any interest of Ernest, Frederick, or William Conway defeased, for they died prior to the termination of the life estate having had children. Thus, the offspring of the sons of William took the property directly upon the failure of the first contingent remainder; no interest in the property passed to them through their parents' estate. *Cf.* Restatement of Property sec. 254, comment *a*, illustration 1 (1940).

We again reiterate that were this all that was to be considered, we would have no doubt that Emma would still be entitled to a one-fourth share of the property since her interest as a child of William was not divested by fact of her having had children. Yet, there remains the language of the gift over to the grandchildren of William, which requires that the proportionate share of their *per stirpes* estate be determined *as if their parent had lived*. If the substitutionary contingent estate in the grandchildren of William "vested" immediately at the death of their parent without reference to the life estate of Emma, and that *per stirpes* share was fixed in a percentage divisible by the finite number of the members of the class, *i.e.*, the four chil-

dren of William, it would be superfluous or redundant to require a subsequent recalculation of those proportionate shares. The fact that the deed requires that the percentage, *per stirpes* share be fixed as of a date subsequent to the time the contingent gift over occurs by reason of defeasance of the prior contingent estates necessarily entails that the potential share available to a child of the predeceased offspring of William was subject to increase. And, that possibility could only arise if, at the termination of the life estate there were children of William who died prior to the termination of the life estate without having had children. Thus, the only construction of the will which is consistent with all the language employed by the grantor requires the conclusion that the death of a child or William prior to the termination of the life estate, with or without having had children, absolutely extinguished that estate. In order to take any estate upon failure of the first contingent remainder the children of William were required to survive the expiration of the vested life estate. Since Emma could not survive herself, upon her death her interest in the estate terminated.

Accordingly, we hold that the trial court erred in determining that survivorship of a child of William as a member of the class designated to take the contingent remainder was not required and the entry of the order decreeing partition must be reversed.

We would also note that we have closely examined each of the cases cited for the proposition that the class of takers under a second contingency is fixed at a date prior to the end of the life estate. Without detailing the facts of those cases, we conclude that each is distinguishable for one or both of the following reasons. In each of the cases cited, a rule of construction was applied determining that the gift over was to individuals rather than to a class, or the future interest in question was a vested rather than a contingent remainder.

For the foregoing reasons, the judgment of the circuit court of Sangamon County is reversed.

Reversed.

McCULLOUGH, P.J., and SPITZ, J., concur.