(No. 63887.—

HARRIS TRUST AND SAVINGS BANK *et al.* v.
FRANCES GLORE BEACH *et al.*, Appellees
(Charles F. Glore III *et al.*, Appellants).

*Opinion filed June 29, 1987.—Rehearing
denied October 5, 1987.*

2

GOLDENHERSH, J., took no part.

Sidley & Austin, of Chicago (Loren E. Juhl, Henry A. Preston and John C. Vryhof, of counsel), for appellants Charles F. Glore III *et al.*

Bell, Boyd & Lloyd, of Chicago (Francis J. Higgins, Robert L. Wiesenthal and Alice S. Lonoff, of counsel), for appellees Frances Glore Beach and Robert Hixon Glore.

Winston & Strawn, of Chicago (Frederick G. Acker, Carol A. Harrington, Nancy J. Brown and Kimball R. Anderson, of counsel), for appellees California Institute of Technology *et al.*

JUSTICE SIMON delivered the opinion of the court:

In construing either a trust or a will the challenge is to find the settlor's or testator's intent and, provided that the intention is not against public policy, to give it effect. (See *Hull v. Adams* (1948), 399 Ill. 347, 352.) Courts search for intent by analyzing both the words used in the

instrument and the circumstances under which they were drafted, including: "the state of the testator's property, his family, and the like." (*Armstrong v. Barber* (1909), 239 Ill. 389, 404.) When, however, the instrument fails to make the settlor's or testator's intention clear, courts often resort to rules of construction to determine the meaning of the terms used in the document. (*Hull v. Adams* (1948), 399 Ill. 347, 352.) Rules of construction, which are applied in the same manner to both wills and trusts, are court created presumptions of what the ordinary settlor or testator would have intended the ambiguous terms to mean; they are merely the court's own assessments of what the person probably meant when the provision was drafted. (*Harris Trust & Savings Bank v. Jackson* (1952), 412 Ill. 261, 266-67.) Such rules should not be allowed to defeat what the ordinary settlor would have intended. When a rule of construction tends to subvert intentions, the rule is no longer legitimate and must be discarded. H. Carey and D. Schuyler, Illinois Law of Future Interests 190-93 (Cum. Pocket Part 1954).

In this case Harris Trust and Savings Bank, Robert Hixon Glore and William Gray III, trustees of two trusts, sought instructions from the circuit court of Cook County regarding to whom and in what manner the trusts should be distributed. The central controversy is over the proper construction of the remainder over to the heirs following the death of a life tenant: specifically, the question is whether the settlor intended that his heirs be ascertained at his death, or whether he desired that they be determined after the death of his wife, who was the life tenant.

The pertinent facts in this case are as follows: Frank P. Hixon and Alice Green entered into an antenuptial agreement dated March 30, 1921, and following that, they were married. The agreement created a trust consisting of 200 shares of preferred stock of Pioneer In-

vestment Company, a Hixon family holding company. The trust provided that Alice was to receive the net income of the trust for life and that she could "dispose of Fifty Thousand ($50,000) Dollars of said fund in such a manner as she" deemed fit and proper. In exchange for the provisions made for her in the trust, Alice surrendered any interest, including dower, which she might have had in Hixon's estate. If Hixon survived Alice, the trust property was to be reconveyed to him. If Alice survived Hixon, the trust provided that on her death "the balance of said trust fund shall be divided among the heirs of the party of the first part [Hixon], share and share alike."

On May 31, 1926, Hixon created a second trust to provide for Alice. The principal of this trust consisted of 300 shares of stock of Pioneer Investment Company. This trust provided that Alice was to receive the income from the principal for life and upon her death "this trust shall terminate, and the trust fund shall be distributed equally among my [Hixon's] heirs."

In 1930, Hixon executed his will, which was interpreted by our appellate court and is not at issue in this case (*Harris Trust & Savings Bank v. Beach* (1985), 145 Ill. App. 3d 682), leaving gifts to specific individuals and charities. He divided the residue of his estate equally among his daughters, Ellen Glore and Dorothy Clark and in trust for Alice. Hixon died in 1931, when he was 69 years old. He was survived by Alice, who was then 49, by Dorothy and Ellen, who were then 38 and 36, respectively, and by his grandchildren, Frances Glore Beach, Charles F. Glore, Jr., and Robert Hixon Glore, who were then minors.

Alice lived for 51 more years. Both the 1921 and the 1926 trusts continued for her benefit until she died in February 1982. At that time, Hixon's then living descendants were his grandchildren, Frances Glore Beach and

Robert Hixon Glore (the grandchildren), and the children of his deceased grandchild, Charles F. Glore, Jr.—Charles F. Glore III, Sallie Glore Farlow, and Edward R. Glore (the great-grandchildren). The parties agree that both the 1921 and the 1926 trust should be distributed in the same manner.

If Hixon's heirs are those surviving at his death, the trust estates will pass under the wills of his two daughters, Ellen H. Glore and Dorothy H. Clark, who both died in 1973. Ellen had three children. One child, as noted above—Charles F. Glore, Jr.—is deceased and survived by three children, Hixon's great-grandchildren. Ellen's other two children—the grandchildren Robert and Frances—are living and are parties to this suit. Dorothy had no children. The devisees under her will are defendants California Institute of Technology, Santa Barbara Foundation, Santa Barbara Cottage Hospital and the Kansas Endowment Association (collectively the charities), and her husband Alfred. Alfred is deceased and his portion of the assets would be distributed to his devisees, Frederick Acker, as special trustee under the will of Charles F. Glore, Jr., and Robert Hixon Glore. On the other hand, if the heirs are determined at the time of Alice's death, the trust estates will be divided among Hixon's now-living descendants—the two grandchildren and three great-grandchildren.

The four charities assert that the heirs should be those heirs alive at Hixon's death; this determination would include them since they were devisees under Dorothy's will. The grandchildren and the great-grandchildren argue that the heirs should be those who were surviving at Alice's death, but they disagree over whether the trust should be divided *per stirpes* (by each share) or *per capita* (by each head).

All parties seeking distribution in their favor filed motions for summary judgment, and the circuit court

granted the motion in favor of the charities. That court held that the class of heirs should be ascertained at Hixon's death. The court concluded that the heirs would be only Hixon's two daughters, since Alice was excluded under the terms of the antenuptial agreement. The circuit court also decided that the Doctrine of Worthier Title (the doctrine), which is discussed more fully below, was an anachronism, and should not be applied to this case. The court observed that although the doctrine was abolished prospectively by statute in 1955 (see Ill. Rev. Stat. 1985, ch. 30, par. 188), it would still be applicable here since both trusts were executed prior to that date. However, because the doctrine consistently thwarted settlors' and testators' intentions, the circuit judge determined that if the doctrine applied at all, it would be applied only as a rule of construction and not as a rule of law; hence, he was not constrained to follow it. Under the circuit court's ruling, the shares would be distributed in this manner:

The grandchildren and great-grandchildren appealed, and the appellate court held that the doctrine applied as

a matter of law. (145 Ill. App. 3d 673.) The appellate court consequently voided the remainder in Hixon's heirs, ruling that the trust reverted to Hixon's estate and passed under the residuary clause of his will. Because the appellate court did not give any effect to the remainder in Hixon's heirs, it was unnecessary for that court to decide whether the class of heirs should be considered at Hixon's or at Alice's death. Under the appellate court's decision, the distribution would be as follows:

We granted the great-grandchildren's petition for leave to appeal to this court. If we reverse both the trial and appellate court by holding that the heirs surviving at Alice's death take the remainder over upon the termination of the life estate, we must then determine whether the trust estate should be distributed *per stirpes*, as the grandchildren contend, or *per capita*, as

the great-grandchildren argue. The distribution *per stirpes* would be as follows:

Dividing the estate *per capita* yields this result:

Three issues are presented on review: (1) whether the heirs are those surviving Hixon's death or Alice's death; (2) whether the doctrine is applicable, and if so, whether it applies as a rule of construction or a rule of law; and (3) whether, if the heirs are determined at Alice's death, the shares should be distributed *per stirpes* or *per capita*. Since the meaning of the word "heirs" as used in the trust is a necessary predicate to the applicability of the doctrine to this case, we begin

by deciding at what point the heirs are to be determined.

## I

The word "heirs" refers to "those persons appointed by the law to inherit an estate in case of intestacy." (*Le Sourd v. Leinweber* (1952), 412 Ill. 100, 105.) When used in its technical sense, the testator's or settlor's heirs are, of course, determined at the time of his or her death. (*Hull v. Adams* (1948), 399 Ill. 347, 352.) This court, however, has never adopted the technical meaning of the word "heirs" as a rule of law. We have observed that " 'heirs' when used in a will does not necessarily have a fixed meaning. It may mean children or, where there are no children, it may mean some other class of heirs *** if the context of the entire will *plainly shows* such to have been the intention of the testator." (Emphasis added.) (*Stites v. Gray* (1955), 4 Ill. 2d 510, 513.) A determination of the class of heirs, therefore, is governed by the settlor's or testator's intention rather than by a fixed rule of law. The rule in Illinois, however, has been that, unless the settlor's intention to the contrary is "plainly shown" in the trust document, courts will rely upon the technical meaning of the term "heirs" by applying it as a rule of construction. (*Harris Trust & Savings Bank v. Jackson* (1952), 412 Ill. 261, 266.) The charities are, therefore, correct in their observation that presently our rule of construction requires us to determine heirs at the settlor's death unless the trust or will provides clear evidence to the contrary. (See, *e.g., Stites v. Gray* (1955), 4 Ill. 2d 510, 513; *Le Sourd v. Leinweber* (1952), 412 Ill. 100, 105; *Hull v. Adams* (1948), 399 Ill. 347, 352.) The initial question we must address is whether we should continue to adhere to this standard of proof.

The charities contend that this high degree of proof is necessary to rebut the rule of construction because of the

policy favoring early vesting of remainders. They refer to one leading commentator's views on implied survivorship and its detrimental effects on early vesting (see Halbach, *Future Interests: Express and Implied Conditions of Survival*, 49 Cal. L. Rev. 297, 304-07 (1961)), as well as to *Evans v. Giles* (1980), 83 Ill. 2d 448, and to *Dyslin v. Wolf* (1950), 407 Ill. 532, which are factually distinguishable from this case, to bolster their position. However, they overlook that two eminent scholars in the field of Illinois future interest law revised their views regarding the policy in favor of early vesting. In the supplement to their treatise entitled the *Illinois Law of Future Interests*, Carey and Schuyler observe that "it was the rule regarding the destructibility of contingent remainders that caused courts to favor the early vesting of estates. \*\*\* But now, in this state and in many others, there is no rule of destructibility. If the original reason for favoring early vesting is gone, why continue to favor it?" H. Carey and D. Schuyler, Illinois Law of Future Interests 190 (Cum. Pocket Part 1954); Ill. Rev. Stat. 1985, ch. 30, par. 40.

Briefly stated, the destruction of contingent remainders was an archaic device which frequently frustrated grantors' intentions by prematurely defeating an interest subject to a condition. By vesting remainders as quickly as possible the drastic effects of destructibility "could be contained by a rule of construction which resulted in declaring that future interests were vested and hence indestructible." (H. Carey and D. Schuyler, Illinois Law of Future Interests 190 (Cum. Pocket Part 1954)). Our legislature abolished destructibility when it passed "An Act concerning future interests" in 1921 (Ill. Rev. Stat. 1985, ch. 30, par. 40). However, despite the passage of this statute, vesting remainders as quickly as possible was such an imbedded rule of construction that in many

cases courts continued to adhere to it without question and regardless of the consequences.

Early vesting frequently frustrates intentions by casting property to strangers. (H. Carey and D. Schuyler, Illinois Law of Future Interests 193 (Cum. Pocket Part 1954); see also *DeKowin v. First National Bank of Chicago* (N.D. Ill. 1949), 84 F. Supp. 918, *rev'd on other grounds* (C.A. Ill. 1949), 179 F. 2d 347 (property goes to second wife of son-in-law); *Peadro v. Peadro* (1948), 400 Ill. 482 (property falls into the hands of the second wife of the testator's niece's widower).) Carey and Schuyler observe that if interests following life estates "are said to be contingent on survivorship, \*\*\* children of the life tenant will take all the property, which seems to accord more with what the testator wanted." H. Carey and D. Schuyler, Illinois Law of Future Interests 192 (Cum. Pocket Part 1954).

In their 1954 supplement to their treatise on future interests, Professors Carey and Schuyler re-examined their earlier view that early vesting is axiomatic. (See H. Carey and D. Schuyler, Illinois Law of Future Interests 399 (1941); H. Carey and D. Schuyler, Illinois Law of Future Interests 190-93 (Cum. Pocket Part 1954).) They state:

> "One does not readily differ from men so learned as Professor Gray and Professor Kales, both of whom seemed satisfied with the axiom that 'the law favors the early vesting of estates.' Accordingly, at the time the principal text was written, and even in 1947, when the first supplement to this was published, the authors were much inclined unquestioningly to accent this ancient dogma. But subsequent further reflection causes one to wonder if the maxim has lost much, if not most of its utility." (H. Carey and D. Schuyler, Illinois Law of Future Interests 190 (Cum. Pocket Part 1954).)

They conclude that "the desirability of retaining the rule of early vesting as a rule of construction \*\*\* warrant[s]

a microscopic scrutiny of it by those charged with the administration of justice." (H. Carey and D. Schuyler, Illinois Law of Future Interest 193 (Cum. Pocket Part (1954).) In the instant case, we have an interest following a life estate. If we follow both the circuit and appellate courts' decisions and vest the heirs' interest as quickly as possible, a large portion of the estate will fall into the hands of strangers. If we reduce the burden of proving that a grantor intended to use "heirs" in a non-technical sense and if that vests the gift at the termination of the life estate, obviously only those heirs surviving the life tenant will share in the remainder.

Whether survivorship ought to be implied is not a case of first impression before this court. A rule of construction regarding implied survivorship was set forth in *Drury v. Drury* (1915), 271 Ill. 336, where this court held that when a gift to a class was "postponed pending the termination of the life estate *** *only those* took who were in existence at the termination of the life estate." (Emphasis added.) (271 Ill. 336, 341.) The effect of *Drury* was to delay the vesting of the gift by adding or implying survivorship for the class of remaindermen to share in the estate.

*Hofing v. Willis* (1964), 31 Ill. 2d 365, 373, clarified *Drury* by stating that implied survivorship was not a mandatory rule of construction. Rather, according to the court in *Hofing*, the grantor's intent regarding this issue should remain paramount. While a later case, *Evans v. Giles* (1980), 83 Ill. 2d 448, 456, also criticized the *Drury* rule, the rationale in that case was that implied survivorship defeated the policy against early vesting. In neither *Hofing* nor *Evans* did this court hold that it was inappropriate to imply survivorship when there was evidence that the grantor intended to do so. Further, *Hofing*, *Evans* and *Dyslin* are distinguishable in an important respect: the gift was not to a class of heirs—a term which

is vague and imports futurity—but rather in *Hofing* to a group of sisters, in *Giles* to a specific individual, and in *Dyslin* to the grandchildren.

We agree with Professors Carey and Schuyler that early vesting of remainders should no longer be followed in this State without question. Early vesting is an axiom which must not get in the way when a contrary intent is demonstrated by a preponderance of the evidence. Requiring *clear and convincing* evidence or a *plain showing* to rebut the presumption in favor of the technical meaning of the term "heirs" (see *Stites v. Gray* (1955), 4 Ill. 2d 510, 513; *Le Sourd v. Leinweber* (1952), 412 Ill. 100, 105; *Hull v. Adams* (1948), 399 Ill. 347, 352), has its roots in the maxim favoring early vesting of remainders. Frequently this policy, as is the case here, frustrates what the ordinary settlor would have intended. We hold that because the primary reason for early vesting is no longer as important as it formerly was, proof by the preponderance of the evidence that the settlor, testator, or donor intended to use the term "heirs" in its nontechnical sense is sufficient to delay the vesting of a gift to a time other than at the grantor's death.

The result of delaying a gift to the heirs is not dramatic. The fear that a contingent remainder could be prematurely destroyed no longer exists. Further, should a predeceased member of the class be excluded from the gift, the result is not drastic. If the predeceased "heir" leaves issue, as is the case here, the settlor's own blood still enjoys the gift. If, on the other hand, a predeceased member fails to leave issue, as also occurred here, the gift is prevented from falling into the hands of strangers. In sum, by altering the degree of proof necessary to delay the vesting of a gift to the heirs, we do no harm. Instead, we further the ordinary grantor's intent, which is exactly what a proper rule of construction ought to do. Consequently, in this case we must deter-

mine which parties have offered the preponderant proof as to Hixon's intent—the charities or the grandchildren and great-grandchildren.

Hixon's trusts, as the charities stress, do not explicitly state the point at which his heirs should be determined. The 1921 trust provides that the "balance of said trust fund shall be divided among the heirs," and the 1926 trust states that "the trust shall be distributed equally among my [Hixon's] heirs." When the trusts are considered as a whole, however, it becomes apparent that the documents revolve totally around Alice's life and death; Hixon's life and death play only secondary roles. As the grandchildren and great-grandchildren note, the trusts were created for Alice's benefit in exchange for her rights to dower or any other portion of Hixon's estate. The trusts were intended to last throughout her life, and depending upon when she died, the trust principal would either revert to Hixon or be distributed to his heirs. Alice's central role in the trust is indicative of Hixon's intent to make her and not himself the point of reference for determining the heirs. Under similar circumstances, our appellate court found the testator's frequent reference to the life tenant's death to be evidence of his intent to look towards the future and to ascertain the heirs at the life tenant's death rather than at his own. (See *Handy v. Shearer* (1967), 81 Ill. App. 2d 461, 464.) In that case the court stated that the frequent references to the life tenant's death suggested "that it was an event and a point of time that weighed heavily in the testator's plan and in his thinking. *** By using the date of the widow's remarriage or death as a date for the determination of 'my legal heirs,' testator's plan is complete." 81 Ill. App. 2d 461, 464.

The circumstances under which Hixon created the trust provide additional evidence of his intent to vest the gift at Alice's death. Hixon was 20 years older than

Alice and he would consequently have expected her trusts to last for a considerable time after his own death. During this time, changes in the family through births and deaths would certainly occur. Rather than leave the remainder of the principal to his daughters, as he left the residue of his estate in his will, his use of an indefinite term such as "heirs" covered the inevitable changes in family circumstances that might occur.

Alice's power of appointment over $50,000 of the trust principal is also evidence of Hixon's intent to ascertain the heirs at her death. The grandchildren and great-grandchildren observe that this power might prevent the heirs from ever enjoying the trust principal; the trust could be worth $50,000 or less when Alice exercised her power of appointment and thus there would be no trust principal left to distribute. The grandchildren's and great-grandchildren's claim that it would be senseless to vest the gift upon Hixon's death when one could not be certain until Alice exercised her power of appointment whether or not there were any assets left for the heirs to possess and enjoy, certainly has merit.

The charities assert that under the common law gifts subject to powers of appointment are always considered to vest at the testator's or settlor's death even though they may be subject to complete or partial divestment. In other words, the charities argue that the remaindermen, in this case Hixon's heirs, would still have a vested right in the trust principal whether or not at the time of distribution it contained any assets. The charities are correct in their interpretation of the common law. (See Moynihan, Introduction to Real Property 120 (1962).) However, they refer to no decision in our State that adopts this position.

Our court has consistently held that the time at which a gift vests ultimately turns upon a "consideration of the whole instrument[, its] creation and by the intent appar-

ently in the mind of their creator as gathered from such instrument." (*Jones v. Miller* (1918), 283 Ill. 348, 356; see also *Fuller v. Black* (1921), 298 Ill. 351, 353.) As we have already noted, Hixon must have anticipated that the trusts for Alice's benefit would last for some time. The value of the trust principal—stock—was likely to fluctuate during this period. The logical conclusion is that Hixon desired to wait before "dividing and distributing" his assets to see if they had any value; it is unlikely that Hixon would have intended to vest a gift which might be worth nothing. While the possibility that there might be nothing left for the remaindermen to take, standing by itself, would not be determinative; it is a factor to be considered along with the other circumstances presented in searching for Hixon's intent.

The grandchildren and great-grandchildren also claim that the language in the trusts instructing the trustees to "divide or distribute" the principal "equally among the heirs" invokes the "divide and pay over rule," which would operate to vest the gift at Alice's death. This rule is one of construction to aid courts in determining whether a gift to a class is a vested or contingent remainder. (*Hull v. Adams* (1948), 399 Ill. 347, 357.) If a gift to a class is vested, it is considered a true legal estate once the trust is executed. On the other hand, if the gift is a contingent, it "is not an estate, but merely the possibility of acquiring one." 399 Ill. 347, 357.

Under the "divide and pay over rule," when a trustee is directed to divide or distribute a gift to a class at a time after the settlor's death, the gift is contingent and possession and enjoyment of that gift are delayed until the time of distribution. The gift is contingent under the rule not only because it is dependent upon the happening of an event—the trustee dividing and distributing the assets—but also because the members of the class who would be alive and able to enjoy the gift would not be as-

certained until the trustees performed their duty of distributing the assets. See *Hull v. Adams* (1948), 399 Ill. 347, 357.

In the present case, Hixon left the trust gift to a class—the heirs—and he employed the key phrase to "divide and/or distribute the trust principal"; it therefore appears that this rule is applicable. However, the charities contend that our court has created this exception to the divide and pay rule: "if such payment or distribution is not deferred for reasons personal to the legatee, but merely because the testator desired to appropriate the subject matter of the legacy to the use and benefit of another *** the vesting of the gift will not be postponed but will vest at once, the right of enjoyment only being deferred." *Knight v. Pottgieser* (1898), 176 Ill. 368, 374.

*Pottgieser* is the only decision in this State that the charities refer to which set forth this particular exception, and a case decided a half century later never mentions *Pottgeiser*. In *Hull v. Adams* (1948), 399 Ill. 347, this court concluded that the rule is applicable whenever it is unclear whether the gift to a class is a contingent or vested remainder. This court stated in *Hull*:

> "It is a general rule that where the donees of a testamentary gift constitute a class, and the only words importing the gift are found in the direction to divide, distribute or pay or to sell the property and distribute or pay over the proceeds in the future, the gift will not vest until the time arrives to pay, divide or distribute, and the members of the class who are to take are to be ascertained at that time and not at the death of the testator. It [the rule] is invoked by the courts to aid in determining the vested or contingent character of future interests." (399 Ill. 347, 357.)

In the present case, the gift to the heirs in the 1921 trust was contingent when it was executed because it was conditioned upon Alice surviving Hixon; if she failed to do so the trust would revert and the heirs' interest

would be defeated. Whether the gift to the heirs continues to be contingent on the heirs surviving Alice or whether their gift vests at Hixon's death is precisely the issue we are confronted with in this case. Consequently, the divide and pay over rule appears to operate and, in view of the ambiguity confronting us, gives us an additional clue as to Hixon's intent.

The provision in the 1921 trust creating a reversion in Hixon should Alice predecease him also advances the grandchildren's and great-grandchildren's argument that Hixon's intention was that the heirs be determined at Alice's death. The reversionary clause conditioned the duration of the trust on Alice's survival. If Alice failed to survive Hixon, the trust would terminate and Hixon's reversion would operate. On the other hand, if Alice survived Hixon, the reversion would not take effect and the principal would be distributed to the heirs. The grandchildren and great-grandchildren persuasively stress that considering the heirs at Hixon's death would lead to nearly the same result as if the reversion had occurred. In both instances the bulk of the principal would pass through the estates of Hixon's two daughters. Hixon's intention that the result was to be different should Alice survive and the reversion fail is an indication that Hixon must have intended that his heirs be determined at Alice's death. Viewing all of these indications with respect to Hixon's intent together, we conclude that the preponderant proof favors the position of the grandchildren and great-grandchildren and Hixon's heirs should therefore be determined at Alice's death.

II

Because we have concluded that it was Hixon's intention that the heirs were to be ascertained at Alice's death, the doctrine of worthier title is not applicable. The doctrine, which was developed in medieval England

but abolished there in 1833, voids a gift to the grantor's heirs. It was premised on the notion that it was worthier to take by descent than by devise. (Moynihan, Introduction to the Law of Real Property 152 (1962).) The doctrine was incorporated into American common law, but in Illinois our legislature abolished it in 1955. See Ill. Rev. Stat. 1985, ch. 30, par. 188.

In Illinois, the doctrine applies only where the devisees would take *exactly the same* estate by devise as they would by descent. (*McNeilly v. Wylie* (1945), 389 Ill. 391, 393.) It "is not applicable where there is a difference in kind or quality of the estate or property to be passed under the devise from that which would descend under the statute [the laws of descent and distribution]." (389 Ill. 391, 393; accord *Darst v. Swearingen* (1906), 224 Ill. 229; *Boldenweck v. City National Bank & Trust Co.* (1951), 343 Ill. App. 569.) Therefore, under Illinois law the doctrine is not likely to operate when the heirs are determined after the termination of a life estate; when vesting is postponed the devisees rarely receive either the same amount or the same estate as they would had their gift taken effect at the testator's death. See *McCormick v. Sanford* (1925), 318 Ill. 544, 546.

Having already concluded that Hixon's heirs are to be determined at Alice's and not at Hixon's death, those who would take Hixon's estate under the laws of descent and distribution had Hixon died intestate—Alice and the two daughters—are not the same as those who will take after Alice's death—the grandchildren and great-grandchildren. As a result, the doctrine is not relevant and therefore we need not reach the other issues briefed before this court: whether the doctrine is a rule of construction or rule of law and whether the doctrine is an anachronism which should be abandoned in the case of trusts established in Illinois prior to our 1955 statutory abolition of the doctrine.

### III

The final question is whether the gift to the grand-children and great-grandchildren should be distributed *per stirpes* or *per capita*. The great-grandchildren contend that because Hixon used the words "share and share alike" and instructed the trustees to distribute the gift "equally," the gift must be divided on a *per capita* basis. The great-grandchildren accurately observe that, "When the words 'equally,' 'equal among,' 'share and share alike,' or other similar words, are used to indicate an equal division among a class, the persons among whom the division is to be made are usually held to take *per capita* unless a contrary intention is discoverable from the will." (*Dollander v. Dhaemers* (1921), 297 Ill. 274, 278.) However, " 'it is worthy of remark that the leading cases which sustain a distribution *per capita* intimate that a very small indication of intent to the contrary would change the rule.' " (297 Ill. 274, 280, quoting *Eyer v. Beck* (1888), 70 Mich 179, 181, 38 N.W. 20.) When a testator leaves his estate to his or her heirs, courts generally conclude that the testator intended the gift to be distributed in accordance with laws of descent and distribution which provide for a *per stirpes* distribution. (*Carlin v. Helm* (1928), 331 Ill. 213, 221-22; see also Ill. Rev. Stat. 1985, ch. 110½, par. 2.1.) Under these circumstances we have stated that "a gift to issue 'equally' and 'share and share alike' does not require that each of such issue shall have an equal share with the other; that the mandate is satisfied if the issue of equal degree taking *per stirpes* share equally." *Condee v. Trout* (1942), 379 Ill. 89, 93.

In the present case, Hixon left the remainder in the trust principal to his heirs. That he provided for his heirs to share equally in that gift fails to rebut the presumption in favor of a *per stirpes* distribution; the gift to the class

of heirs is a sufficient indication that Hixon intended the remainder to be divided in accordance with the laws of descent and distribution. This conclusion is bolstered by the wording of the statute, in effect both at Hixon's death and when he executed the trusts, which used the terms "equally among" and in "equal parts" in describing the *per stirpes* distribution of estates. That Hixon employed the words "equally" and "share and share alike" in his instructions to the trustees regarding the division of his estate is therefore not inconsistent with an intention that the heirs share equally under a *per stirpes* distribution. See Ill. Rev. Stat. 1937, ch. 39, par. 1.

The cases cited by the great-grandchildren in which the court provided for a *per capita* distribution are distinguishable. In *Carlin v. Helm* (1928), 331 Ill. 213, 222, not only was the gift made to *named individuals* and not to a class, but also the court stated that had the gift been devised to the class of heirs, it would have divided the remainder differently. In *Northern Trust Co. v. Wheeler* (1931), 345 Ill. 182, another case cited by the great-grandchildren, the language explicitly stated that the remainder be divided *per capita*.

We conclude that the remainder in the heirs should be distributed *per stirpes* with the three great-grandchildren each taking one-ninth of the estate and the two grandchildren each taking one-third. The judgments of both the circuit and appellate courts are reversed and the case is remanded for a distribution of the trust principal in a manner consistent with this opinion.

*Judgments reversed;*
*cause remanded.*

JUSTICE GOLDENHERSH took no part in the consideration or decision of this case.