ESTATE OF VICTOR J. STRAUSS, DECEASED, VICTOR J. STRAUSS, JR., SUSAN STRAUSS ROBERTS AND JILL V. SUTTLE, CO-EXECUTORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Strauss v. Commissioner
Docket No. 1305-94
United States Tax Court
T.C. Memo 1995-248; 1995 Tax Ct. Memo LEXIS 250; 69 T.C.M. (CCH) 2825; June 8, 1995, Filed *250 Decision will be entered under Rule 155. For petitioner: Stephen D. Reynolds For respondent: Gerald W. Douglas RAUM
RAUM
MEMORANDUM OPINION RAUM, Judge: The Commissioner determined a Federal estate tax deficiency of $ 405,209.03 (less $ 61,275.27 additional credit for State death taxes, if substantiated). After concessions, the only matter in controversy is whether the value of assets of a trust of which Victor J. Strauss (Victor or the decedent) was a beneficiary and a trustee is includable in his gross estate under section 2041. [1] He died on February 12, 1990, and at the time of his death, was domiciled in Danville, Illinois. The petitioner is the Estate of Victor J. Strauss, acting by and through its co-executors, Victor J. Strauss, Jr., Susan Strauss Roberts, and Jill V. Suttle. As stipulated by the parties, the "legal residence [of the co-executors] at the time of filing the *251 petition herein [was] at P. O. Box 6068, Portland, Oregon." Decedent's mother, Martha V. Strauss (Martha), died on August 15, 1969. Decedent's sister, Ruth Strauss (Ruth), died without issue on April 7, 1977. Decedent's ex-spouse, Jane Strauss, died on April 4, 1991. Decedent and Jane Strauss were the parents of the three co-executors in this case, Victor J. Strauss, Jr. (Victor, Jr.), Susan Strauss Roberts, and Jill V. Suttle. The Last Will and Testament of Martha V. Strauss (the will or Martha's will) was executed on April 24, 1969. Article IV, paragraph A of the will provides, in part, as follows: The trustees shall, if my daughter Ruth survives me, create two trusts, one to be designated "RUTH STRAUSS TRUST" and one to be designated "VICTOR J. STRAUSS TRUST" and shall distribute one-half (1/2) in value * * * to Ruth Strauss Trust and one-half (1/2) in value * * * to Victor J. Strauss Trust * * *
Under the will, as described above, one-half of Martha's residuary estate was to be distributed to her two children, Victor and Ruth as co-trustees of the Ruth Strauss Trust, and the remaining one-half was to be distributed to the decedent and Ruth as co-trustees of the *252 Victor J. Strauss Trust. Following Ruth's death on April 7, 1977, the Ruth Strauss Trust was added to and became a part of the Victor J. Strauss Trust, pursuant to Article IV, paragraph B, of Martha's will. At that time the decedent became the sole income beneficiary of the Victor J. Strauss Trust. Article IV, paragraph C. 1. of Martha's will provides, in part, as follows: The trustees shall, during the lifetime of Victor J. Strauss, pay to or use all the net income for Victor J. Strauss; if, in the trustees' sole discretion, they deem it necessary to use any or all of the principal of the Victor J. Strauss Trust for his care and comfort, considering his standard of living as of the date of my death and considering his income, right to income and other property he may have, as known to the trustees, they may pay to or use for him all or any part of the principal of that trust for such purposes.
Article IV, paragraph C. 2. and 3. of the will provides that upon the decedent's death, the trust property of the Victor J. Strauss Trust should be continued in trust for the benefit of the decedent's ex-spouse, Jane Strauss, if surviving, and, if not, for the benefit of Ruth *253 Strauss for her lifetime. Article IV, paragraph D of the will provides that upon the death of the survivor of the decedent, Jane Strauss, and Ruth Strauss, the remaining trust property shall be continued in trust for the benefit of the surviving children of the decedent and the surviving lineal descendants of any deceased child of the decedent. After Ruth's death on April 7, 1977, the decedent became the sole trustee of the Victor J. Strauss Trust. The decedent continued to serve as the sole trustee from April 7, 1977, until September 12, 1977. After Ruth's death there were no distributions from the Victor J. Strauss Trust to the decedent until sometime after September 12, 1977. The parties stipulated that the "decedent began receiving distributions of income, but not principal, from the [Victor J. Strauss] Trust after September 1977." On September 12, 1977, by written instrument, the decedent appointed his son, Victor, Jr., as co-trustee of the Victor J. Strauss Trust. [2] The decedent and Victor, Jr., continued to serve as co-trustees of the Victor J. Strauss Trust from September 12, 1977, until the decedent's death on February 12, 1990. *254 In September 1984, all of the trust assets of the Victor J. Strauss Trust were transferred to Portland, Oregon, apparently the area of residence of Victor, Jr., for administration by him. The transfer of the trust assets to Oregon was done pursuant to Article VI, paragraph C, of Martha's will. The fair market value of the assets of the Victor J. Strauss Trust at the time of the decedent's death was $ 928,000. Petitioner excluded the value of the property held by the Victor J. Strauss Trust (i.e., $ 928,000) from the decedent's gross estate, and did not report that amount as an asset of the decedent on the Federal Estate Tax Return. The principal issue is whether the decedent had a general power of appointment over the trust property within the meaning of section 2041(b)(1), which defines such power as "a power which is exercisable in favor of the decedent, his estate, his creditors, or the creditors of his estate". But section 2041(b)(1)(C)(ii) provides that if such power can be exercised only "in conjunction with a person having a substantial interest in the property, subject to the power, which is adverse to its) exercise * * * in favor of the decedent -- such power shall *255 not be deemed a general power of appointment." During their respective periods as co-trustees, Ruth until her death and Victor, Jr., beginning some 5 months thereafter when appointed as co-trustee, each had a substantial interest in the property adverse to the exercise of the power as described in section 2041(b)(1)(C)(ii). And there is no disagreement between the parties that, except for that period of some 5 months, decedent's power was not a general power of appointment within the statutory definition. However, the Commissioner contends that the decedent's power ripened into a general power of appointment upon Ruth's death. Following her death the decedent, as the sole trustee, could appoint property to himself (invade corpus) according to the provisions of Martha's will. Relying upon section 2041(a)(2), the Commissioner argues further that the appointment of Victor, Jr., as a co-trustee, constituted a release of this general power of appointment "by a disposition which is of such nature that if it were a transfer of property owned by the decedent, such property would be includable in the decedent's gross estate under sections 2035 to 2038, inclusive." In particular, it *256 is the Government's position that section 2041(a)(2) is made applicable by section 2036(a)(1), relating to a transfer of property with a retained right to income for life. The Commissioner's argument requires a preliminary determination that the decedent, immediately following Ruth's death, possessed a general power of appointment which continued for some 5 months (a window of opportunity) until the appointment of Victor, Jr., as co-trustee. The definition of a "general power of appointment" found in section 2041(b)(1) was added as part of the Powers of Appointment Act of 1951, ch. 165, 65 Stat. 91. The definition survives in the Code unchanged since its original adoption in 1951. One of the principal purposes of the Powers of Appointment Act of 1951 was to provide a clear-cut definition of a general power of appointment. As the legislative history shows, the definition of a general power of appointment was intended to provide "a test of taxability which is simple, clear-cut, and easy to apply. * * * Your committee believes that the most important consideration is to make the law simple and definite enough to be understood and applied by the average lawyer, and that the present *257 bill will accomplish that purpose." H. Rept. 327, 82d Cong., 1st Sess. at 4 (1951). The bill as originally introduced in the House contained the following definition of a general power of appointment: "For the purposes of this subsection the term 'general power of appointment' means only an unlimited, unrestricted power which is exercisable in favor of the decedent, his estate, his creditors, or the creditors of his estate." H.R. 2084, 82d Cong., 1st Sess. sec. 2(a) (1951). The final bill, as passed by the House and Senate, did not contain the qualifying language" unlimited, unrestricted power". The report of the Committee on Ways and Means states: While the words 'unlimited, unrestricted' have been eliminated from the definition by the committee amendment, the definition provides that, if certain limitations or restrictions are present, a power is not a general power even though exercisable by the decedent in his own favor." (Emphasis added.) H. Rept. 327, supra at 5. The committee report makes clear that limitations on a decedent's power to appoint property to himself, his estate, his creditors, or the creditors of his estate must come within the statutorily prescribed *258 limits if such a power is not to be classified as a general power of appointment. While the use of this definition may mean that powers not properly considered general powers of appointment for State property law purposes will be swept into the statutory definition, adherence to that definition is said to fulfill the congressional goal of providing a test that is "simple, clear-cut, and easy to apply." [3] *259 H. Rept. 327, supra at 4. Thus, in its attempt to provide a bright line test for a general power of appointment for Federal estate tax purposes, the congressionally adopted definition may be both broader and more restrictive than state law definitions of a general power of appointment. [4]
The decedent, as the sole trustee of the Victor J. Strauss Trust from April 7, 1977, until September 12, 1977, had the power, if he deemed it necessary, "to use any or all of the principal of the Victor J. Strauss Trust for his [the decedent's] care and comfort, considering his standard of living as of the date of my [Martha V. Strauss's] death". Absent an applicable statutory exception, the decedent's power was a general power of appointment under section 2041(b)(1). However, section 2041(b)(1)(A) does contain a potentially relevant exception to the definition of" general power of appointment", [5] stating: (A) A power to consume, invade, *260 or appropriate property for the benefit of the decedent which is limited by an ascertainable standard relating to the health, education, support, or maintenance of the decedent shall not be deemed a general power of appointment.
The exception found in section 2041(b)(1)(A) calls for a two-step analysis. First, the power of appointment must be limited by an ascertainable standard. Second, that ascertainable standard must relate to the health, education, support, or maintenance of the decedent. The Commissioner argues that the decedent's power to invade corpus for his "care and comfort" was not limited by an ascertainable standard. The Government's position is that "comfort" is too amorphous to provide an ascertainable standard. The Commissioner relies upon section 20.2041-1(c)(2), Estate Tax *261 Regs., which states: "A power to use property for the comfort, welfare, or happiness of the holder of the power is not limited by the requisite standard." What we have here is a limitation based on "care and comfort", unlike "happiness", which is obviously an open-ended, unascertainable standard, cf. Merchants Natl. Bank of Boston v. Commissioner, 320 U.S. 256 (1943) ("happiness"); Henslee v. Union Planters Natl. Bank & Trust Co., 335 U.S. 595 (1949) ("pleasure"); but see Ithaca Trust Co. v. United States, 279 U.S. 151 (1929) ("comfort" found to be an ascertainable standard). However, both parties agree that a decision as to whether a standard is ascertainable must be based on how that standard would be interpreted under applicable State law. Morgan v. Commissioner, 309 U.S. 78, 80 (1940); Helvering v. Stuart, 317 U.S. 154, 161 (1942). And both parties agree that Illinois law governs the Victor J. Strauss Trust. It is our opinion that the power of invasion, as it would be interpreted by the Illinois Supreme Court, is limited *262 by an ascertainable standard. Of considerable importance here is an opinion of the Court of Appeals for the Seventh Circuit in an Illinois case that interprets "comfort" as a word of limitation. Pyle v. United States, 766 F.2d 1141 (7th Cir. 1985). Since the Seventh Circuit is the circuit that includes Illinois, its interpretation of Illinois law is entitled to particular deference. Helvering v. Stuart, supra at 163. In Pyle the Court of Appeals was called upon to decide whether a life tenant's power of invasion was limited by an ascertainable standard so that the remainder interest represented a completed gift. The life tenant could invade corpus for her "health, support, comfort and maintenance." Id. at 1144. The plaintiff focused on the word "comfort" to argue that an ascertainable standard did not exist, so a completed gift did not exist. [6] The Court of Appeals found that As Rock Island Bank & Trust Co. v. Rhoads, [187 N.E. 139 (Ill. 1933)], illustrates, "comfort" is indeed an ascertainable standard under Illinois law. It refers to maintaining someone in the station *263 of life to which that person is accustomed. Since [the life tenant's] station in life is known, the standard is measurable and hence ascertainable.
Pyle v. United States, supra at 1145-1146. We find the reasoning of the Court of Appeals compelling, and see no reason to differ from it here. [7]
*264 The Commissioner attempts to distinguish Pyle v. United States by pointing out that the standard in Pyle had other words of limitation (i.e. health, support, and maintenance), which were construed along with "comfort". However, in both the present case and in Pyle, "comfort" would provide the widest standard for invasion. Both cases are properly judged by the latitude offered by the inclusion of "comfort" as a standard. Further, the decedent's power of invasion was based on his comfort "considering his standard of living as of the date of * * * [Martha's] death and considering his income, right to income and other property as he may have". These additional words of limitation make clear that Martha intended that" comfort" be interpreted consistently with the above quoted language. We turn now to the second part of the section 2041(b)(1)(A) exception: the ascertainable standard must also relate to the health, education, support, or maintenance of the decedent. "A power is limited by such a standard if the extent of the holder's duty to exercise and not to exercise the power is reasonably measurable in terms of his needs for health, education, or support (or any combination *265 of them)." Sec. 20.2041-1(c)(2), Estate Tax Regs. "Although sec. 2041(b)(1)(A) does not contain the word 'solely,' the statute must be construed as if it contained that word. Failure to so interpret sec. 2041(b)(1)(A) would obviate words chosen by Congress." Estate of Little v. Commissioner, 87 T.C. 599, 601 n.5 (1986). The Commissioner argues that "care and comfort, considering his standard of living", as interpreted by the Illinois Supreme Court, would include items not within the meaning of "health, education, support, or maintenance." The Commissioner states: "For example, 'care and comfort' and 'standard of living' may include normal travel, entertainment, luxury items, and other expenditures which are not required for meeting the decedent's health, education, support, or maintenance." We think that the Commissioner attempts to impose too narrow a standard. No case that authoritatively defines "support" has been cited by either party. However, the Commissioner's own regulations state: "As used in this subparagraph, the words "support" and 'maintenance' are synonymous and their meaning is not limited to the bare necessities of life." Sec. 20.2041-1(c)(2), *266 Estate Tax Regs. The Supreme Court of Illinois stated that "comfort" should be interpreted so that the life tenant was maintained "in the station in life to which she was accustomed." Rock Island Bank & Trust Co. v. Rhoads, supra at 144. We fail to see how this materially differs from "support in his accustomed manner of living," an acceptable standard under the regulations. Sec. 20.2041-1(c)(2), Estate Tax Regs. This leads us to conclude that a standard designed to maintain the decedent in his station in life does relate to the decedent's health, education, support, or maintenance, as interpreted by the regulations. The Government also argues that the decedent's mother, Martha V. Strauss, knew how to restrict a power by the requisite standard when she chose to do so. The Commissioner points out that following the deaths of the decedent, Ruth Strauss, and Jane Strauss, distributions from principal could be made to the children of the decedent for their "reasonable support, comfort and education." [8]
*267 However, the Commissioner also recognizes that the general rule for construing a trust under Illinois law is to find the settlor's intent. See Harris Trust & Savings Bank v. Beach, 513 N.E.2d 833 (Ill. 1987). In light of the fact that, at the time Martha's will was executed, the decedent was 47 years old, it is easy to conclude that Martha was not concerned with the decedent's education. Her main concern, as demonstrated by the terms of her will, was to maintain her two children in their accustomed standard of living. The terms of her will, under Illinois law, were effective in reaching that objective. Having decided that the decedent never possessed a general power of appointment as defined by section 2041(b)(1), we need not decide whether the appointment of Victor, Jr., represents a "release" of a power that requires the inclusion of the property subject to the power in the decedent's estate. We find that the decedent's power to appoint the trust corpus to himself, as interpreted under Illinois law, was limited by an ascertainable standard. We find, further, that the standard relates to the health, education, support, or maintenance of the *268 decedent. In order to reflect determinations made by the Commissioner in the notice of deficiency that were not contested by petitioner, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at the date of decedent's death.↩
2. There is no controversy between the parties as to the decedent's authority to appoint Victor, Jr., as co-trustee.↩
3. We recognize that the effort to attain such simplicity could well result in a mirage. Cf. Foxman v. Commissioner, 41 T.C. 535, 551, n.9 (1964), affd. 352 F.2d 466 (3d Cir. 1965). And in 5 Bittker and Lokken, Federal Taxation of Income, Estates and Gifts, par. 128.1, at 128-3 (2nd ed. 1993), the authors referred to "all of the complexities of the tax definition", i.e., the sec. 2041(b)(1)↩ definition. (Emphasis supplied.)
4. See 5 Bittker and Lokken, supra at par. 128.1 at 128-3: "In distinguishing general from nongeneral powers under sec. 2041(b)(1), federal law, rather than state nomenclature, is controlling. A power satisfying the conditions of sec. 2041(b)(1) is a 'general'power, even if state law characterizes it as 'special'; conversely, a power that does not satisfy sec. 2041(b)(1)↩ is not a general power, even if it is so labeled by state law." (Fn. ref. omitted.)
5. Petitioner argues that the exception found in sec. 2041(b)(1)(C)(ii) also applies. In light of the conclusion hereinafter reached that the exception under sec. 2041(b)(1)(A)↩ applies, we need not address this point.
6. Interestingly, in Pyle v. United States, 766 F.2d 1141↩ (7th Cir. 1985) the Government was arguing that "comfort" did represent an ascertainable standard under Illinois law, exactly the opposite of its position here. No reason for this change of position was suggested by the Commissioner here.
7. See also Est. of Klafter v. Commissioner, T.C. Memo. 1973-230, holding that for purposes of secs. 2036(a)(2) and 2038(a)(1), a power of invasion to provide for the "support, maintenance, health, education and comfortable living" of the beneficiary was limited under Illinois law by an ascertainable standard (also citing Rock Island Bank & Trust Co. v. Rhoads, 187 N.E. 139↩ (Ill. 1933)).
8. It is not evident to us why the inclusion of the word "comfort" in the standard by which distributions of principal may be made to Martha V. Strauss's grandchildren does not, under the Commissioner's argument as articulated in the case in chief, create a standard that is not limited by the requisite standard, exactly the opposite of the argument made by the Commissioner.↩