WARREN-BOYNTON STATE BANK, Executor under the Will of E. Mae Wallbaum, Deceased, *et al.*, Appellants, v. WILLIAM DUKE WALLBAUM *et al.*, Appellees.

*Opinion filed May 18, 1988.—Rehearing denied October 3, 1988.*

MILLER, J., took no part.

Barber, Segatto, Hoffee & Hines, of Springfield (Henry R. Barber, Richard C. Edwards, Carol O. Hoffee and R. Kurt Wilke, of counsel), for appellants.

Burger, Fombelle, Baxter, Zachry & Rathbun, P.C., of Decatur (Norman J. Fombelle and James E. Zachry, of counsel), for appellees William Duke Wallbaum *et al.*

Wham & Wham, of Centralia (William B. Wham, of counsel), for appellee Hudelson Baptist Children's Home.

JUSTICE CLARK delivered the opinion of the court:

The following issues are presented for review in what originated at the trial court level as a partition action requiring construction of language in a 1903 deed: (1) whether alternate contingent remainders created in the 1903 deed are subject to an implied condition of survival to the date of distribution, that is, the time of the death of the life tenant, or whether the remaindermen are in-

stead to be determined at the death of the grantor; (2) whether the Doctrine of Worthier Title is applicable to the deed in question; and (3) whether the Rule in Shelley's Case is applicable to the deed.

The trial court granted the plaintiffs' (appellants here) motion for summary judgment and motion to strike counterclaim and denied defendants' motion to dismiss. An order for partition was entered setting forth the interests of the parties. From this order certain defendants appealed. The appellate court reversed. (143 Ill. App. 3d 628.) We granted the plaintiffs' petition for leave to appeal pursuant to Rule 315. 107 Ill. 2d R. 315(a).

Appellants are the executor of the estate of Emma Mae Wallbaum, the daughter of the grantor of the deed in question, and the executor of the estate of Elaine B. Stillwell, a beneficiary under the will of Emma Mae Wallbaum. Appellees are certain descendants of William Wallbaum's three sons.

In 1903 William Wallbaum executed a deed by which he conveyed 400 acres of property in Sangamon County to his daughter Emma Mae by creating a life estate. Emma Mae's life estate would become possessory at the termination of the life estate which he reserved for himself. The exact language of the deed is as follows:

"The Grantor, William Wallbaum (widower) of the County of Sangamon and State of Illinois for and in consideration of One Dollar and other good and valuable considerations in hand paid, conveys and warrants to Emma May Wallbaum of the County of Sangamon and State of Illinois. A life estate in the following described real estate, to-wit: [legal description omitted.]

Hereby releasing and waiving all rights under and by virtue of the Homestead Exemptions Laws of this State. The said William Wallbaum hereby reserves a life estate in the above described land to-wit: He shall have the right to the use and occupancy of said land and to all the

rents, issues and profits thereof during his natural life. And upon the death to said Emma May Wallbaum leaving children of her body her surviving, the above described real estate shall descend to such children share and share alike. The children of any deceased child, taking only the share which their parent would inherit if living. Upon the death of said Emma May Wallbaum leaving no such children her surviving the above described real estate shall descend to the heirs of said William Wallbaum share and share alike. The children of any deceased child taking only the share which their parent would inherit if living."

At the time of the transfer William was 65 years old and Emma Mae was 5. Her mother, William's second wife, had died the previous year. Emma Mae had two half-brothers who were in their thirties, children of William's first marriage. Several months after executing the deed here in question, William married a third time. He had a fourth child, a son, during this marriage. William died, however, in 1905 before his youngest son was six months old.

William Wallbaum's will devised all of his property to his four children and to Martha, his third wife. The will contained no residuary clause and no mention was made of the 400 acres involved here. Over his life time William had accumulated nearly 2,000 acres of farmland in and around Sangamon County. As he got older he gradually transferred some of the acreage to each of his two older sons. While he transferred some of the acreage absolutely in fee, he transferred other acreage with a retained life estate. All of the property transferred to the two sons was, however, in fee at the termination of the reserved life estate. Through his will he left certain acreage to his youngest son in a life estate with alternate contingent remainders similar to those in the deed here in issue. This particular language used in the deed to his youngest son will be discussed in more detail later.

Emma Mae died in 1984, the last of William Wallbaum's children to survive. Her older brothers, Ernest and Frederick, had died in 1928 and 1926, respectively. Each was survived by children. Her younger brother, W. Conway, died in 1941, also survived by a child. Emma Mae never married and had no children.

All parties agree that by the 1903 deed the following estates existed: (1) reserved life estate in William Wallbaum, (2) life estate in Emma Mae Wallbaum, (3) contingent remainder in the children of Emma Mae, (4) alternate contingent remainder in the "heirs of William Wallbaum." Both life estates are extinguished and there is no disagreement that the contingent remainder to Emma Mae's children failed, as she died without children. At issue is the interpretation of the alternate contingent remainder: "Upon the death of said Emma May [*sic*] Wallbaum leaving no such children her surviving the above described real estate shall descend to the heirs of said William Wallbaum share and share alike. The children of any deceased child taking only the share which their parent would inherit if living." The interpretation depends on what is meant by the phrase "heirs of said William Wallbaum."

The trial court, in a memorandum of opinion, held that the "heirs of said William Wallbaum" in the alternate contingent remainder meant "heirs" in the technical sense of the word, *i.e.* those taking his property by will or intestacy. "Heirs" in this technical sense are always determined at the time of the grantor's death. At William Wallbaum's death he had as his heirs his four children: Ernest, Frederick, Emma Mae and W. Conway. Emma Mae was a member of that class of heirs. Since the deed contained no language creating a condition that the heirs must survive the life tenant, and the court would not imply such a condition, Emma Mae received a one-fourth vested interest in the property at her death.

This one-fourth interest was to pass according to the terms of Emma Mae's will. The remaining three-fourths was to be distributed one-fourth to the heirs of each deceased brother. The diagram attached as Appendix I illustrates this distribution.

The appellate court, reversing the trial court, held that the word "heirs" was used in its nontechnical sense to mean "children." Having equated "heirs" with "children," the appellate court determined that there was an implied condition of survival, that is, that William's children must survive the life tenant in order to take as remaindermen. Since Emma Mae could not survive herself she took nothing. The remainder to each of William Wallbaum's other children, the court indicated, was extinguished at each one's death, but the gift over to the "children of any deceased child" vested that particular portion at the time of the child's death with a child or children surviving subject to subsequent increase or decrease. Although the appellate court gave no directions or remand, a careful reading and analysis of the court's opinion indicates that it would order distribution of the 400 acres here in question as follows: one-third to the descendants of each son of William Wallbaum. (143 Ill. App. 3d 628.) A diagram of that distribution is attached as Appendix II.

The entirely different results reached by the two lower courts is illustrative of the confusion which prevails in the law of future interests. There is a pervasive cloud of uncertainty which surrounds this field of law. This obscurity and uncertainty has had its uses. Often it seems as if a particular court will first determine an equitable distribution and thereafter fill in the blanks with appropriate bits and pieces of the law of future interests in order to reach the desired result. This is by no means an indictment of any court but merely an indica-

tion of the quagmire that confronts a court in reaching its opinion.

Central to our discussion here is a determination of the meaning of "heir" in the alternate contingent remainder. The question is not one of what we might determine to be fair in light of our modern day understandings, but one of what the grantor meant by his use of the word in the deed. (*Hull v. Adams* (1948), 399 Ill. 347.) What was William Wallbaum's intent?

Our goal is to ascertain the grantor's intent and to give it effect, provided that his intention is not violative of a settled rule or contrary to public policy. (*Hull v. Adams* (1948), 399 Ill. 347.) In interpreting intent, the rules of will construction also apply to deeds. (*Seymour v. Bowles* (1898), 172 Ill. 521, 524.) Intent is found by analyzing the specific words used in conjunction with the circumstances under which they were drafted. These circumstances may include "the state of [the testator's] property, his family, and the like." (*Armstrong v. Barber* (1909), 239 Ill. 389, 404.) The entire document must be considered. (*Storkan v. Ziska* (1950), 406 Ill. 259, 263.) None of the words are considered meaningless or repugnant or surplusage. (*Dolley v. Powers* (1949), 404 Ill. 510.) No one clause, phrase or sentence determines the intent. (*Barnhart v. Barnhart* (1953), 415 Ill. 303.) When the intention is not clear, the courts must resort to rules of construction to determine the meaning. (*Hull v. Adams* (1948), 399 Ill. 347, 352.) But these rules of construction are only to govern where "the language of the will is so ambiguous as to place the testator's intention in doubt." *Harris Trust & Savings Bank v. Jackson* (1952), 412 Ill. 261, 266.

The term "heir" may be used as a technical legal word to designate those persons who would take property, whether real or personal, in case of intestacy. (*Harris Trust & Savings Bank v. Jackson* (1952), 412

Ill. 261, 269.) When used in this purely technical sense, heirs are determined at the time of the testator's or grantor's death unless the instrument in question provides clear evidence to the contrary. (*Stites v. Gray* (1954), 4 Ill. 2d 510, 513; *Hull v. Adams* (1948), 399 Ill. 347, 352.) As we noted in *Harris Trust & Savings Bank v. Beach* (1987), 118 Ill. 2d 1, however, our court has not adopted the technical meaning of the word "heir" as a rule of law. (118 Ill. 2d at 10.) The determination of "heirs" is governed by the transferor's intent.

*Beach* involved construction of the terms of a trust which conveyed a life estate interest in certain stock and left the remainder to be divided among the heirs of the settlor. The interest was created in exchange for the life tenant's promise not to make any other claims on the settlor's estate as part of an antenuptial agreement. Although based on a bargained-for exchange entered into between two adults in 1921, and thus factually distinguishable from this case, the decision in *Beach* depended on a question which is pertinent here. That question was whether the settlor intended that his heirs be ascertained at his own death or, instead, after the death of the life tenant. In holding that the settlor intended that his heirs be determined at the death of the life tenant, we held that the burden of proof need no longer be by "clear evidence" but should be by a preponderance of the evidence. (118 Ill. 2d at 10.) A showing by a preponderance of the evidence that the settlor, testator, or donor intended to use the term "heirs" in this nontechnical sense, that is, heirs to be determined at a time other than at the grantor's death, is sufficient to delay the vesting of a gift. 118 Ill. 2d at 14.

Thus, the term "heirs" can be used nontechnically in two different instances. We need to distinguish and clearly clarify these different instances because one of these meanings was relied upon erroneously by the ap-

pellate court and was also urged as an interpretation by both the appellants and appellees. In its nontechnical use, "heirs" may be used as a synonym for the words "children" or "grandchildren." (*Stites v. Gray* (1954), 4 Ill. 2d 510, 513.) It may also, however, be used to mean "heirs" of the testator or grantor to be determined at a time other than his or her own death. *Harris Trust & Savings Bank v. Beach* (1987), 118 Ill. 2d 1, 10.

While we agree with the appellate court that William Wallbaum used the term "heir" in a nontechnical sense, we do not agree with its conclusion that the term was used as a synonym for the word "children." Rather, we believe that the language of the deed indicates that he meant that the time for determination of the heirs should be different than the time of his own death. More precisely, we believe that he meant that the heirs should be determined at Emma Mae's death. Several factors support this conclusion. We look first to the deed itself and the language used in the entire document. William Wallbaum intended that his daughter have a life estate only. Any fee interest would vest either in her children or her children's children should they come into being (the contingent remainder) or alternatively in the heirs of William Wallbaum (the alternate contingent remainder). These prior references to "children" suggest that when William Wallbaum meant "children" he said "children." Indeed, he could have referred to Emma Mae's children as her heirs for the sake of continuity, but he did not. While the use of the word "heirs" in the alternate contingent remainder does not alone determine intent, the use of that word in a document where the word "children" was used previously strongly suggests that William Wallbaum used the word he meant. We see no reason to doubt that Mr. Wallbaum used the word in the alternate contingent remainder that he intended.

In conjunction with the language in the deed, we also looked to the circumstances surrounding the creation of the deed. These circumstances also suggest that William Wallbaum was thinking of his heirs at the time of Emma Mae's death and not of his own children. Mr. Wallbaum, as we already noted, was 65 years old when he conveyed the life estate to his five-year-old daughter. He had two sons who were already in their thirties. Mr. Wallbaum was well versed in the turns, changes and evolutions of family life; he had himself recently lost his second wife, who was herself a young woman at the time of her death. With some 60 years difference in age between him and his young daughter and approximately 30 years difference between his sons and his daughter, it seems logical that he would be very much aware of the possibility that both he and his sons would die before Emma Mae. The conveyance itself shows that he wanted to provide some concrete means for Emma Mae's future support. Additionally, in reviewing the record we take note of Mr. Wallbaum's will, executed two years after this deed. By that time he had married Martha, his third wife, and had an infant son. In making provision for his youngest child, he instructed one of his older sons to convey a life estate interest in certain property to this young son. The transfer, William indicated, was to contain the following instruction as to the remainder interest:

> "And upon the death of the said William Conway Wallbaum leaving children of his body surviving him, the above described real estate shall descend to such children, share and share alike. The children of any deceased child taking only the share which their parent would inherit if living. Upon the death of William Conway Wallbaum leaving no such children surviving, the above described real estate shall descend to *my surviving children* share and share alike. The children of any deceased

child taking only the part that their parent would inherit if living." (Emphasis added.)

In creating this alternate contingent remainder, William used the word "children." William Wallbaum used the word "children" when that was what he meant.

We are aware, as was William Wallbaum, that by 1905 the Wallbaum family situation had changed. In 1903 William probably assumed that in all likelihood his young daughter would outlive her only brothers. Indeed, although the record does not indicate the year Ernest's or Frederick's children were born, it seems safe to conjecture that Ernest was married and had children of his own when his father executed his will. We suggest this because the guardianship of young Emma Mae was given to her brother, Ernest, and not to her stepmother. It seems unlikely that Ernest would be given her guardianship if Ernest was not already a father himself. Thus Emma Mae and William's grandchildren were closer contemporaries than his sons and his daughter. William would know that the potential existed for his grandchildren to die before his own child, Emma Mae. William was not looking towards a future where his sons, nor perhaps even his grandchildren, would take the property he was transferring to Emma Mae. It made sense to provide an alternate contingent remainder that would, if it were used, leave the property to descendants alive at the death of Emma Mae rather than to his own children or grandchildren who were likely to die before Emma Mae.

In 1905, the year William wrote his will, the circumstances had changed. It was very foreseeable that Emma Mae would live as long as or longer than her infant brother, W. Conway. William therefore instructed that the remainder be distributed to his "surviving children." These surviving children, in all probability, would include Emma Mae. William gives every appearance of knowing

his family situation and saying exactly what he meant. We will not now negate his intent and construe the word "heir" in the alternate contingent remainder of the 1903 deed as meaning "children" when he did not say "children" and when it seems more reasonable to construe the word "heir" as meaning takers at a time other than the grantor's own death.

Appellants' arguments to construe heirs as those of William Wallbaum at his death are not persuasive. We have already noted the great age disparities among members of the family alive at the creation of the deed in 1903. William had every reason to believe that Emma would outlive all of them—her life interest was the focus of the deed. Takers under the alternate contingent remainder could not take until the death of Emma Mae without children or grandchildren. The appellants' reliance on cases such as *Hofing v. Willis* (1964), 31 Ill. 2d 365, and *Evans v. Giles* (1980), 83 Ill. 2d 448, is unpersuasive. The *Hofing* deed left the alternate contingent remainder to the "sisters" of the life tenant, individuals whose identity was not in question. In the *Evans* will, the alternate contingent life estate and remainder went to a named individual. These cases present entirely different situations than we now confront.

Therefore, under the "preponderance of evidence" test enunciated in *Harris Trust & Savings Bank v. Beach*, determination of the heirs of William Wallbaum to take at the termination of the life estate shall be at the death of the life tenant, Emma Mae Wallbaum.

Because the heirs of William Wallbaum are to be determined at the death of Emma Mae, we need not here deal with the concept of implied condition of survival. We note, however, that the language in the last sentence of the alternate contingent remainder serves as a limitation on the distribution to the heirs. We construe the language to mean that each surviving familial line of de-

scent is to share the property equally. Surviving descendants are found in Ernest's line of descendants and in W. Conway's line of descendants. Emma Mae died without issue and the last survivor of Frederick's line died in 1965, 19 years prior to the death of the life tenant. Therefore, distribution among the heirs is as shown in the diagram attached as Appendix III.

Because the appellants presented the issues of the applicability of the Doctrine of Worthier Title and the Rule in Shelley's Case, we will briefly address them, but note that they are not necessary to a determination of this case. Determination of the heirs at a time different than the grantor's death precludes application of the Doctrine of Worthier Title. Our court fully addressed that issue in *Harris Trust & Savings Bank v. Beach*, 118 Ill. 2d at 20. Additionally, the Rule in Shelley's Case is inapplicable because the deed did not create the life estate in William Wallbaum, whose heirs were the remaindermen; it merely reserved the life estate in property he owned in fee prior to the transfer. A remainder in the grantor's heirs does not trigger the rule. *Cahill v. Cahill* (1949), 402 Ill. 416.

We conclude that the remainder in the heirs be distributed one-half to W. Conway's line of descendants and one-half to Ernest's line of descendants. The judgments of both the circuit court and appellate courts are reversed, and the case is remanded to the circuit court of Sangamon County for entry of an order of partition in a manner consistent with this opinion.

*Judgments reversed;*
*cause remanded.*

JUSTICE MILLER took no part in the consideration or decision of this case.

APPENDIX I – TRIAL COURT DIAGRAM

# APPENDIX II – APPELLATE COURT DIAGRAM

APPENDIX III – REMAND DIAGRAM

