FOURTH DIVISION
FILED: May 10, 2007

No. 1-06-1713

| | | |
|---|---|---|
| THE NORTHERN TRUST COMPANY, | ) | Appeal from the Circuit |
| Trustee of the Caroline E. Haskell Trust, | ) | Court of Cook County, |
| | ) | County Department |
| Plaintiff-Appellee, | ) | Chancery Division |
| | ) | |
| v. | ) | No. 04 CH 19234 |
| | ) | |
| ELIZABETH YATES KNOX, MICHAEL LLOYD | ) | |
| YATES, ELIZABETH LEE LOUGHRAN, DEBORAH | ) | |
| LEE HELLER, WALTER W. BELL, not individually but | ) | |
| as TRUSTEE OF THE DEBORAH LEE TRUST, | ) | |
| CYNTHIA HEALY ELLIS, WINSTON HEALY JR., | ) | |
| JONATHAN L. HEALY ELIZABETH CONDICT | ) | |
| LANGE, CAROLYN G. LANGE CLARKE, STACY | ) | |
| LANGE COLUMBO, CONNIE LEE FOSTER, | ) | |
| GERRITT DAVIS FOSTER, III, LAWRENCE LEE | ) | |
| FOSTER, CHERYL LYNN FOSTER, CHARLES | ) | |
| CLAYTON ELIOT, THE NEW ENGLAND | ) | |
| CONSERVATORY OF MUSIC, HAROLD SMITH | ) | |
| SCHUTT, JR., THE TOWER HILL SCHOOL | ) | |
| ASSOCIATION, WILMINGTON TRUST COMPANY, | ) | |
| not individually but as TRUSTEE OF THE LOUISE P. | ) | |
| SCHUTT TRUST dated 11-2-64, CHARLES PORTER | ) | |
| SCHUTT, JR., SARAH LOUISE SCHUTT HARRISON, | ) | |
| CAROLINE DuPONT SCHUTT BROWN, ERIK | ) | |
| FRANZ-EUGENE STREITWIESER, CHARLES | ) | |
| EDWARD STREITWIESER, BERNHARD THOMAS | ) | |
| STREITWIESER, CHRISTIANE CECELIA | ) | |
| STREITWIESER BUNN, GRETA BROWN LAYTON | ) | |
| SCHUTT, JULIA DeHAVEN BREED DODSON, | ) | |
| HEERLEIN RIGGS BANK, N.A., not individually but as | ) | |
| TRUSTEE OF THE RICHARD EDWARDS BREED | ) | |
| III TRUST, RICHARD EDWARDS BREED, LYNN | ) | |
| EDWARDS BREED SNYDER, MARTHA GARRETT | ) | |
| BREED, BB&T TRUST, not individually but as | ) | |

TRUSTEE OF THE GEORGE BREED REVOCABLE )
TRUST, ANA MARIA DePELLECER, THE JANE )
BREED DePELLECER TRUST f/b/o JUAN JOSE )
DePELLECER, THE JANE BREED DePELLECER )
TRUST f/b/o RICHARD EDWARDS BREED, PAUL )
EDWARD JOHNSON JR., JOAN J. JOHNSON, JAMES )
THAYER JOHNSON, JR., JAMES CALVIN )
ALDRIDGE, JR., CHRISTOPHER BRINSON )
ALDRIDGE, CAROLYN BRINSON ALDRIDGE, )
GIDEONS INTERNATIONAL, THE GREAT )
COMMISSION, PATRICIA MARTIN HARMON, )
PAULENE MARTIN PUTNAM, WILLIAM CHARLES )
MARTIN, WILLIAM BRANTLEY ALDRIDGE, JR., )
EMMA EUGENIA ALDRIDGE BEAUFORD, FRANCES )
PAULINE ALDRIDGE, ELLA LOUISE ALDRIDGE )
REED, EDMUND CARLTON ALDRIDGE III, MARION )
DOUGLAS ALDRIDGE, GERALD FRANKLIN )
ALDRIDGE, ELSIE J. ALDRIDGE, LUCY ELIZABETH )
A. DAVIS, LANDON THOMAS ALDRIDGE, )
PATRICIA ANN ALDRIDGE PENNINGTON, PAMELA )
SUE A. McCASLIN, THOMAS WAYNE ALDRIDGE, )
JR., RUTH WARREN ALDRIDGE, STEPHEN MORRIS )
ALDRIDGE, ST. LUKE UNITED METHODIST )
CHURCH OF AUGUSTA, GEORGIA, ANNIE MARIE )
ALDRIDGE, TIMOTHY CARLTON ALDRIDGE, )
KENNETH WILLIAM ALDRIDGE, GEORGE NEIL )
ALDRIDGE, JAMES MERLIN CHRISTOPHER, JR., )
EDWARD WILLIAM ACTON CHRISTOPHER, )
JAMES DAVID CHRISTOPHER, CONSTANCE )
CHRISTOPHER JONES VAUGHN, EARLINE )
BALDWIN ALDRIDGE, EDGAR ALLEN ALDRIDGE, )
JR., MARJORIE E. ALDRIDGE, FRANK CARLTON )
ALDRIDGE, JR., MARSHA ELIZABETH ALDRIDGE )
GAFFIN, LISA LILLIAN ALDRIDGE YIALYS, )
GEORGE EDGAR ALDRIDGE, SARA ERIKSON )
ALDRIDGE STEVENS, MARY JO ALDRIDGE )
RAKOSKE, WILLIAM GEORGE ALDRIDGE, )
BARBARA A. ALDRIDGE, ELIZABETH L. ALDRIDGE )
SHUMPERT, MARY ANN ALDRIDGE RAY, )
MARION FRANCIS HITE CARPENTER, GLENN )
KENDALL VAN SANT, SR., STEFAN VAN SANT, )
CAMILLE VAN SANT, GLENN KENDALL VAN )
SANT, JR., MARY PAYSINGER RINGER, EDNA )

HITE PAYSINGER JACKSON, RICHARD D.                )
BRADLEY, WAYNE ALBON SCOTT, SR.,                    )
MELISSA WINDHAM, SCOTT BARKLEY, WAYNE     )
ALBON SCOTT, JR., MARION LINDELL SCOTT,          )
EDWARD HITE SCOTT, FRANCES BATES HAIR,          )
DORIS BATES QUARLES, ANGELA B. BATES, )
JAMES TODD BATES, WILLIAM EDWARD BATES,      )
JERRY MICHAEL BATES, TERESA ANN BATES,          )
DAVID EVERETTE BATES, JR., CLYDE ANDERSON   )
BATES III, ILENE BATES FORD, WILLIAM A. RAWL, )
JR., JOHN DURHAM BONEY, JR., NANCY BONEY      )
LEE, VANDERLYN S. RAWL, JAMES FRANK RAWL,   )
JR., BETTY ANNE RAWL, LAWRENCE                       )
LAFFORTHUN, THE ESTATE OF GEORGE EDWARD  )
GERRIE, deceased, JEAN HAMLIN REITER, LINDA F.  )
McCULLOGH KILGORE, JAMES BERT FITZGERALD, )
MICHAEL R. FITZGERALD, KATHLEEN FITZGERALD)
INGRAM, JEFFREY TODD HAMLIN, MICHONE          )
ELIZABETH HAMLIN SNYDER, ERIC J. NILSON, not  )
individually but as TRUSTEE OF THE PAUL G.           )
HAMLIN TRUST, ADA MARGARET BYRNE                 )
WHEELER HUNTER, BARBRA ANN WHEELER            )
PATCH, GEORGE FORREST BUTTERWORTH III,        )
LUCILE WHEELER-VAUGHN, HARRY ROBERTS         )
WHEELER, JR., FREDERICK HASKELL WHEELER,      )
DAVID HALE BURLAND, NAOMI LUCILE                   )
BURLAND WAHLSTROM, HASKELL ROBBINS            )
BURLAND, MONA KOELB CLIFFORD, PALMER          )
WHEELER KOELB, WRIGHT BARTON ALDRIDGE,       )
JR., ADELE K. HANNAH, GERALD H. GAGNIER,         )
MARIE N. GONYO, ROLAND GONYO, MARIAN           )
EUNICE NORTH WINCH, GULLIFORD, RODNEY E.      )
NORTH, CAROLINE MABEL NORTH PASCO,              )
MARVIN E. KRAUSS, CHARLES BREWSTER              )
PRENTISS III, JULIAN BLAKE PRENTISS HAGEN,        )
JULIA M. PRENTISS, ROBERT THADDEUS               )
ELLETT III, THELMA D. ELLETT, LARS R. HAGEN,      )
SR., LOIS G. PHILLIPS, JEANETTA HARD               )
WEATHERFORD, WILLIAM HENRY HARD,               )
ARTHUR L. JONES, MARY RIVERS KELLO,               )
JOSEPH H. McGEE, JR., CHARLES GOODWIN           )
WHITMIRE, JAMES MARTIN WHITMIRE, JR.,            )
EVELYN JENNINGS WHITMIRE, FRANCES C.            )

SIMONDS, JOHN C. SIMONDS, JR,. CHARLES R.      )
SIMONDS, AUGUSTUS H. HAYDEN IV, THOMAS      )
EPTING HAYDEN, SUZANNE JANOTHA, MANFRED   )
JANOTHA , THOMAS MARSHALL WEST IV,      )
STEPHEN M. WEST, KATHERINE McCALLUM      )
GOODWIN, ELIZABETH W. WEST, CAROLINE      )
HASKELL SIMPSON, DIANA HASKELL SHEWALTER,)
HENRY HAMILTON HASKELL, SR., MARY      )
THEODOSIA HASKELL, JAMES TILLSON, MARIAN   )
BLAYNEY TILLSON, THOMAS PAGET TILLSON,      )
STEPHEN TILLSON, LINDABISSELL KNECHTEL,      )
STORY BISSELL KORNBLUTH, GRAHAM HENRY      )
RICHARDSON, PAGET DANIELS RICHARDSON,      )
CINTHIA RICHARDSON CALKINS, LOUIS DEAN      )
FREDERIC FRASCHE, ROBERT McLANE FRASCHE,   )
JAMES WILLIAM FRASCHE, FRANCES P. DODD      )
PAHLMANN, NANCY DODD FERGUS, SANDRA      )
HASKELL DODD WILKINSON, THE ESTATE OF      )
WILLIAM MILLER OUTCALT, JR., deceased, and      )
certain unknown potential remainder beneficiaries,      )
                                                                              )
                            Defendants-Appellees )
                                                                              )
(The New England Conservatory of Music,                  )        Honorable Bernetta D. Bush,
                                                                              )        Judge Presiding
                            Defendant-Appellant). )

JUSTICE MURPHY delivered the opinion of the court:

This action was brought by plaintiff, The Northern Trust Company, as trustee of the

Caroline E. Haskell Trust (Northern Trust), which sought instructions from the trial court on how

to distribute the trust principal upon termination of the trust. Defendant New England

Conservatory of Music (NEC) and defendant Charles C. Eliot filed cross-motions for summary

judgment arising from their mutual claim of the same one-sixth share of the trust principal known

as the "Lucy Smith" share. The trial court, finding that Eliot was entitled to the entire "Lucy

Smith" share of the trust principal, granted Eliot's motion for summary judgment and denied NEC's motion. On appeal, NEC argues that the trial court incorrectly determined when the trust vested. For the following reasons, we affirm the decision of the trial court.

## I. BACKGROUND

Caroline E. Haskell executed a trust indenture on July 7, 1892, and a companion trust indenture on April 15, 1896, that transferred real property to Northern Trust as trustee. Under the terms of the trust, after Caroline's death, each of 17 named individuals (First Takers) received a specified income interest in the trust until the earlier to occur of the trust's termination or the income beneficiary's death. Specifically, "paragraph FIRST" provided that Lucy Smith, Caroline's sister and one of the 17 First Takers, would receive one-sixth of the income interest "for and during her natural life should she survive said party of the first part, and after her death, or after the death of said party of the first part should she survive said Lucy Smith, and up to the time of the final sale and distribution of the proceeds of said property as hereinafter provided, to the lawful heirs of the said Lucy Smith, *per stirpes.*"

Furthermore, pursuant to "paragraph SECOND" of the trust, the trust terminated on October 14, 2003, 21 years after the last to die of certain named individuals, which included Haskell; three First Takers, including Lucy Smith; and the children of those three First Takers, including Lucy Smith's children, Lillian MacLennon and Lucius Waldo Smith, Jr. "Paragraph SECOND" provided that upon the termination date, the property was to be sold and the proceeds were to be distributed either (1) among the First Taker's lawful heirs, *per stirpes*, as to the three First Takers named as measuring lives; or (2) to the First Taker, if living, otherwise to the First

Taker's lawful heirs, *per stirpes*, as to the 14 First Takers not named as measuring lives. The trust specifically provided that one-sixth of the trust principal was to be distributed "among the lawful heirs of the said Lucy Smith, *per stirpes*."

Caroline died in April 1900, and each of the First Takers died before the termination of the Trust. Lucy Smith died in 1935 with two lawful heirs: Lucius Waldo Smith, Jr., and Lillian MacLennan. Lucius died in 1936 and bequeathed his entire interest in the Trust to his sister, Lillian. From 1936 until her death in 1961, Lillian received the one-sixth income interest originally paid to Lucy Smith.

Lillian's will provided that her husband, Norman MacLennon, and son, Sidney F. Eliot, were each to receive a lifetime one-half interest of the income interest, which NEC would receive upon their respective deaths. Lillian's will also attempted to bequeath her interest in the proceeds of the final sale and distribution of the trust property to NEC.

Sidney Elliot died a widower in 1985. He had one child, Charles Eliot, who survived him. Charles Eliot is Lucy Smith's great-grandchild and her only surviving heir.

Soon after the trust terminated, Northern Trust filed this action seeking a determination as to the remainder beneficiaries under the Trust. NEC and Charles Eliot each attempted to claim Lucy Smith's share and filed cross-motions for summary judgment. NEC argued that the trust vested at the time of the First Taker's death and, therefore, Lucy Smith's "lawful heirs" were determined as of Lucy Smith's death. Accordingly, Lucius and Lillian were entitled to Lucy Smith's share of the net proceeds of the trust estate at the time of the termination of the trust, and Lillian could bequeath her share of the trust principal to NEC. Eliot, however, claimed that

vesting was determined at termination of the trust. Therefore, Eliot, Lillian's grandson, was entitled to the Lucy Smith share of the trust principal.

The trial court held that a 1929 Illinois Supreme Court case interpreting the trust addressed the question of vesting, while a 1933 circuit court decree interpreting the trust addressed the question of who was to receive the income. The 1933 decree gave lawful heirs of First Takers the right to dispose of the income in any way they wanted but did not give them the right to dispose of the principal. Although the court did not believe that the 1929 case had a *res judicata* effect, it found the case to be "very instructive." Accordingly, Lucy Smith's "lawful heirs" would be determined for purposes of the principal distribution at the time of the termination of the trust, not at the time of Lucy Smith's death. Therefore, the trial court granted Eliot's motion and found he was entitled to the entire "Lucy Smith" share of the trust.

The trial court found that there was no just reason for delaying enforcement of the order granting Eliot's motion for summary judgment and denying NEC's motion. This appeal followed.

## II. ANALYSIS

Summary judgment is appropriate when the pleadings, depositions, and other evidence reveal that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005 (West 2004). Summary judgment is a drastic means of resolving litigation and should only be allowed when the right of the moving party is clear and free from doubt. *Bier v. Leanna Lakeside Property Ass'n*, 305 Ill. App. 3d 45, 50 (1999). An appellate court's review of a grant of summary judgment is *de novo*. *Woods v. Pence*, 303 Ill. App. 3d 573, 576 (1999).

Eliot and NEC agree that there is no genuine issue of material fact but disagree as to when the trust vested. NEC argues that the 1933 decree held that Lucy Smith's "lawful heirs" were determined as of Lucy Smith's death, while Eliot contends that the parties are bound by the 1929 case because it determined that the sole interest of the initial heirs was income interest. Furthermore, both NEC and Eliot argue that the plain language of the trust and/or rules of construction support their respective positions.

### A. Previous Trust Constructions

NEC contends that the 1933 decree held that Lucy Smith's "lawful heirs" were determined as of Lucy Smith's death, and the parties are bound by it pursuant to the doctrine of collateral estoppel. Conversely, Eliot argues that the 1933 decree only sets the time at which heirship is determined at each generation, not the time for vesting of the principal interest. Instead, Eliot contends, the parties are bound by the 1929 supreme court case because it determined that the sole interest of the initial heirs was income interest. As such, Lillian MacLennan could not bequeath an interest in the principal.

### 1. 1929 Supreme Court Case

Like the trial court, we find the 1929 supreme court case to be dispositive. In 1925, the trustee of the Haskell trust sought instructions from the circuit court as to whether it should execute a contract accepting increased rent in exchange for allowing the lessee to demolish and replace a building on the land. Wallace Condict, son of First Taker Louisa Condict, and Lucy Smith, a First Taker, objected to the lease. Louisa Condict and her son, Wallace, like Lucy Smith and her children, were named as measuring lives in "paragraph SECOND." In *The Northern*

*Trust Co. v. Thompson*, 336 Ill. 137, 154 (1929), our supreme court rejected Wallace Condict's and Lucy Smith's objections and found that the contract was in the beneficiaries' best interests. The court also stated,

"It is not suggested how or in what manner the rights of [Wallace] Condict, or of those in his class in their relation to the property, can be adversely affected by the new building under the long-term lease. Their right to possession of the lot, and the building on it, is not affected, for no such right is vested in them. Their sole right under the terms of the will is in their portion of the income, enhanced by the compromise agreement at Condict's insistence[,] though not as much as he demanded. Under the terms of the trust[,] the fee will not pass to any of the present beneficiaries. At the expiration of twenty-one years after the death of the last survivor of Mrs. Haskell and of her descendants named in the trust instrument, the trustee is directed to sell and convey the leasehold interest and distribute the net proceeds of the sale as directed. It is not contended that security for the income of the ultimate beneficiaries is imperiled by the new building." *Thompson*, 336 Ill. at 153-54.

We agree with Eliot that because Lillian, as a fellow initial heir, was in the same "class" as Wallace Condict, the supreme court determined that the sole interest of the initial heirs was income interest.

NEC argues that the trial court misconstrued the supreme court's reference to the "fee" when it stated that under the terms of the trust, "the fee will not pass to any of the present

beneficiaries." The trial court held that in this context, the "fee" was the principal, whether it was in fee simple or cash. NEC attempts to limit the supreme court's holding by arguing that it must have meant that no beneficiary would ever receive fee title to the underlying real estate. However, it would not make sense for the supreme court to bar Condict and those in his class from objecting to the lease if it believed that they were owners of the trust remainder but had no interest in the building.

In this same vein, NEC argues that the "present beneficiaries" of the trust in 1929 include initial heirs who could receive trust principal at the termination date because they were not named as measuring lives. Therefore, it contends, when the supreme court stated that present beneficiaries would not receive the "fee," it must have meant the actual title to the real estate, since the property was to be sold at the termination of the trust and the cash was to be divided and distributed among remainder beneficiaries. We again reject NEC's strained reading of the opinion; even assuming the validity of NEC's definition of "present beneficiaries," the supreme court would not prohibit the owners of a trust corpus from objecting on the basis that the building owned by the trust would be sold at some point.

NEC also contends that the trial court erred in relying on the 1929 case because it misconstrued the case's holding on the merits of the beneficiaries' cross-bill as a holding on their standing. NEC cites the following passage from the supreme court opinion:

> "It is also contended that the bill should have been dismissed for want of
> necessary parties. All necessary parties--that is, all persons having a present
> interest in the subject matter of the controversy and who would take a distributive

share if distribution had been made at the commencement of the suit--were parties to the suit. Others who would take in the event of those who were parties were represented by them. [Citation.] The trustee represents those having a contingent interest in the trust fund. [Citations.] All present or contingent interests were properly represented and are bound by the decree." *Thompson*, 336 Ill. at 157.

NEC contends that these findings state that the "present beneficiaries," which included Wallace Condict, were necessary parties. See *Village of Lansing v. Sundstrom*, 379 Ill. 121, 125 (1942) (general rule is that beneficiaries of a trust are necessary parties to an action brought to foreclose their interests). Thus, as a necessary party, Wallace Condict had standing by definition. NEC's interpretation, however, would go against the supreme court's clear statement that Condict, and those in his class, only had an interest in the income of the trust and would render it superfluous.

Furthermore, according to NEC, the only reference to Condict's allegation on the issue of standing appears in the appellate court opinion, which states that "[o]ther allegations are made, particularly as regards Condict's interest in the rents and in the trust estate upon a final distribution, etc." *The Northern Trust Co. of Chicago v. Thompson*, 245 Ill. App. 20, 32 (1927), *overruled*, *The Northern Trust Co. v. Thompson*, 336 Ill. 137 (1929). NEC contends that Condict's claim to 100 % of his mother's share based on the Rule in Shelley's Case was the full extent of the "other allegations" regarding Condict's interest in the trust estate upon a final distribution. However, the supreme court, which did not identify who asserted that argument, summarily dispensed with an objection based on the Rule in Shelley's Case because there was no real estate to which the rule could apply, since the real estate would be sold at the termination of

the trust. *Thompson*, 336 Ill. at 156-57. It did not link its holding regarding the Rule in Shelley's Case with its ruling regarding standing.

Eliot argues that NEC is bound by the 1929 opinion pursuant to the doctrine of collateral estoppel. Collateral estoppel "is an equitable doctrine of judicial origin created to prevent relitigation of previously adjudicated claims and is founded in principles of judicial economy." *Ballweg v. City of Springfield*, 114 Ill. 2d 107, 113 (1986). The requirements for the application of collateral estoppel include the following: (1) the issue decided in the previous litigation was identical to the one presented in the case in question, (2) there was a final judgment on the merits, and (3) the party against whom estoppel is asserted is a party or in privity with a party from the prior adjudication. *Ballweg*, 114 Ill. 2d at 113.

Eliot argues that NEC is in privity with the parties in the 1929 case because it is a legatee under the will of an initial heir. Eliot cites *People ex rel. Burris v. Progressive Land Developers, Inc.*, 151 Ill. 2d 285, 296 (1992), in support of his contention that privity contemplates successive interests in the same property rights that were the subject of prior litigation, and a successor in interest is bound by the judgment of that prior litigation. However, an argument that NEC is a "successor in interest" seems to belie Eliot's other argument that NEC has no interest in the principal of the trust. While the 1929 case does not have a collateral estoppel effect, the sound reasoning of the supreme court is accepted.

### 2. 1933 Superior Court Decree

On July 12, 1933, the superior court of Cook County also interpreted the trust in a decree filed in *The Northern Trust Co. v. Condict,* No. 530534. In that case, the superior court held that

the First Takers only had a life interest in the net rents from the trust property. Upon the deaths of the First Takers, their respective heirs were vested with an indefeasible equitable interest in the First Taker's share of net rent, which they could convey by will. *Condict*, slip op. at 17. While the overwhelming majority of the decree involved the vesting of the income interest under "paragraph FIRST" of the trust, the court briefly discussed "paragraph SECOND." Under Article XXVI, the court stated that the issue was raised:

> "as to the persons who will be entitled to take the net proceeds of sale of the trust estate at the time of the termination of the trust under the provisions of paragraph numbered 'Second' of said Trust Indenture of July 7, 1892, in this, whether in the respective gifts to *** the lawful heirs of Lucy Smith *per stirpes*, *** if such first takers, respectively, be not living at the time of the termination of the trust, the lawful heirs referred to are the lawful heirs of their respective ancestors determined as of the time of the ancestor's death, or the lawful heirs of their respective ancestors determined as of the time of the termination of the trust." *Condict*, slip op. at 95-96.

The court concluded:

> "That the lawful heirs referred to of the named ancestors in the provisions of said paragraph numbered 'Second' of such Trust Indenture, providing for the distribution of the net proceeds of sale in shares as there set forth, are and will be, under the proper construction of said Trust Indenture, the lawful heirs of their respective ancestors as of the respective times of the death of such ancestors."

*Condict*, slip op. at 96.

Section M of the 1933 decree also repeats the second paragraph verbatim. See *Condict*, slip op. at 120. NEC argues that the 1933 decree dictates that Lucy Smith's "lawful heirs" were determined as of Lucy Smith's death. Therefore, Lucius and Lillian were entitled to bequeath their interest, and Eliot had no claim to the principal.

NEC admits that the cited portions of the 1933 decree are *dicta* and, therefore, only instructive. Furthermore, we find that even if the superior court ruled on when the trust principal vested, such a ruling would be contrary to the supreme court's 1929 interpretation of the trust. A decision of the Illinois Supreme Court is binding on all trial courts. *Garcia v. Hynes & Howes Real Estate, Inc.*, 29 Ill. App. 3d 479, 482 (1975).

It is also significant that while the superior court specifically held several times that income interests had "vested" at the deaths of the First Takers, the word "vesting" does not appear in subsection M, the portion of the decree relating to the principal of the trust. Finally, it was impossible for Lucius or Lillian to receive any trust principal because they were measuring lives; the trust could not terminate until at least 21 years after their deaths. To allow the trust principal to vest in the very people who could not receive any of the trust principal would be contrary to Haskell's intent.

## B. Language of the Trust

The language of the trust also supports our conclusion that the principal vested upon termination of the trust. Our goal is to ascertain the grantor's intent and to give it effect, provided that her intention is not violative of a settled rule or contrary to public policy. *Warren-*

*Boynton State Bank v. Wallbaum*, 123 Ill. 2d 429, 436 (1988). Intent is found by analyzing the specific words used in conjunction with the circumstances under which they were drafted, including the state of the testator's property, her family, and the like. *Wallbaum*, 123 Ill. 2d at 436. None of the words is considered meaningless, repugnant, or surplusage, and no one clause, phrase, or sentence determines the intent. *Wallbaum*, 123 Ill. 2d at 436. "When the intention is not clear, the courts must resort to rules of construction to determine the meaning." *Wallbaum*, 123 Ill. 2d at 436.

The Haskell trust shows a clear intent to postpone vesting of the principal until the termination of the trust. In *Harris Trust & Savings Bank v. Beach*, 118 Ill. 2d 1 (1987), the testator entered into a trust agreement providing that the income was to be paid to his wife for life, and upon her death, the balance would be divided among the testator's heirs. At the time of the wife's death, the testator's then-living descendants were his two grandchildren and three great-grandchildren. The parties disputed whether the testator's heirs should be ascertained at his death or the death of his wife, the life tenant.

Although the word "heirs" refers to " 'those persons appointed by the law to inherit an estate in case of intestacy,' " our supreme court has never adopted the technical meaning of the word "heirs" as a rule of law. *Beach*, 118 Ill. 2d at 10, quoting *Le Sourd v. Leinweber*, 412 Ill. 100, 105 (1952). A determination of the class of heirs is, therefore, governed by the testator's intention rather than by a fixed rule of law. *Beach*, 118 Ill. 2d at 10. Unless the settlor's intention to the contrary is "plainly shown" in the trust document, courts will rely on the technical meaning of the term "heirs" by applying it as a rule of construction. *Beach*, 118 Ill. 2d at 10.

The court noted that the policy of early vesting of remainders was so imbedded that courts continued to adhere to it without question and regardless of the consequences. *Beach*, 118 Ill. 2d at 11-12. "Early vesting frustrates intentions by casting property to strangers"; accordingly, the court held that early vesting of remainders should no longer be followed in this state without question. *Beach*, 118 Ill. 2d at 12, 14. Because the primary reason for early vesting is no longer as important as it formerly was, proof by the preponderance of the evidence that the settlor intended to use the term "heirs" in its nontechnical sense is sufficient to delay the vesting of a gift to a time other than at the grantor's death. *Beach*, 118 Ill. 2d at 14.

The court found that when the trust was considered as a whole, the documents revolved around the wife's life and death rather than the testator's. *Beach*, 118 Ill. 2d at 15. Furthermore, because his wife was 20 years younger than him, the testator would have expected the trust to last for a considerable amount of time, during which changes in the family through births and deaths would likely occur. *Beach*, 118 Ill. 2d at 15-16. Finally, the fact that the trust granted the wife the power of appointment over the trust principal suggested that the testator intended to ascertain his heirs at her death because one could not be certain until after she exercised her power of appointment whether there were any assets left to enjoy. *Beach*, 118 Ill. 2d at 16.

We agree with Eliot that the trust in this case revolved around the lives of the measuring lives, as the trust in *Beach* revolved around the wife's life. In addition, Haskell set the termination date out as far as the rule against perpetuities would allow and would have expected that changes in her family, including births and deaths, would occur. That the trust designated family members as original beneficiaries and no nonfamily members were named as beneficiaries is also significant.

Therefore, we find that the trust vested at the time of termination, not at the time of Lucy Smith's death.

NEC, however, contends that the gift-over language ("the lawful heirs of said Lucy Smith, *per stirpes*") in both paragraphs "FIRST" and "SECOND" is identical and should be interpreted the same. Therefore, because the parties agree that the income interest vested at the death of the respective First Taker, the principal interest should also be interpreted as vesting at the death of the First Taker.

Contrary to NEC's argument, the language of the two sections is different. While "paragraph FIRST" states that the First Taker and the lawful heirs of the First Taker, *per stirpes*, are entitled to a life interest in the income interest of the trust, "paragraph SECOND" provides that upon termination of the trust, the proceeds were to be distributed either (1) among the First Taker's lawful heirs, *per stirpes*, as to the three First Takers named as measuring lives; or (2) to the First Taker, if living, otherwise to the First Taker's lawful heirs, *per stirpes*, as to the 14 First Takers not named as measuring lives. Because Lucy Smith was one of the measuring lives, the trust provided that the principal would be distributed to the heirs of Lucy Smith, *per stirpes*. Therefore, the phrase "the lawful heirs of the said Lucy Smith, *per stirpes*" cannot refer to the same people in both paragraphs "FIRST" and "SECOND." In "paragraph FIRST," this phrase expressly includes Lillian, but in "paragraph SECOND," it clearly excludes Lillian because the trust cannot terminate until at least 20 years after her death. It was, therefore, impossible for the principal to vest in either Lucy Smith or Lillian Smith, through which NEC claims its right to trust principal, since they were both named as measuring lives. See *Maiorano v. Virginia Trust Co.*,

216 Va. 505, 219 S.E.2d 884 (1975) (by using different language in specifying the vesting of income and directing the vesting of principal, the testator intended a different result).

NEC relies on *Kellett v. Shepard*, 139 Ill. 433 (1891), in support of its argument that the phrase "heirs at law, *per stirpes*" has the same meaning in paragraphs "FIRST" and "SECOND." In *Kellett*, a will provided that the testator's daughter would receive a life interest in the income from part of his estate. At the daughter's death, the principal would go to her children, but if "she died having no issue, in such case to go to and descend in reversion to my heirs-at-law." *Kellett*, 139 Ill. at 437. The daughter died without issue, so the court had to determine whether the testator's "heirs-at-law" were determined at the time of death of the testator or his daughter.

The court noted that ordinarily, the words "heirs" or "heirs-at-law" are used to designate people who answered that description at the death of the testator because the word "heir," in its technical import, applies to the persons appointed by law to succeed to the estate in case of intestacy. *Kellett*, 139 Ill. at 442. "Hence where the word occurs in a will, it will be held to apply to those who are heirs of the testator at his death, unless the intention of the testator to refer to those who shall be his heirs at a period subsequent to his death is plainly manifested in the will." *Kellett*, 139 Ill. at 442. The court found that it "is no proof of such contrary intention that the daughter, at the expiration of whose life-estate the distribution was to be made, was herself one of the heirs at law," nor does it make a difference whether those who are heirs at the time of the testator's death are living or dead when the period of distribution arrives. *Kellett*, 139 Ill. at 443. Citing the preference for early vesting of remainder estates, the court held that although the trustee held the legal title, equitable title was vested in the heirs at the time of the testator's death,

subject to divestment if the daughter had children. *Kellett*, 139 Ill. at 443.

Furthermore, the income of the principal fund was to go to the testator's widow during life and after her death, "in reversion to my heirs at law." *Kellett*, 139 Ill. at 448. The court noted that if the heirs at law designated by the will are those at the respective periods of distribution, then the heirs at law at the widow's death might not be the same as the heirs at law at the daughter's death. It was more reasonable to assume that the testator intended to leave both portions to the same people than to assume that he intended "heirs at law" to have one meaning at the termination of the daughter's life estate and another meaning at the termination of the widow's life estate. *Kellett*, 139 Ill. at 448.

NEC also relies on *McKibben v. Pioneer Trust & Savings Bank*, 365 Ill. 369 (1937). In *McKibben*, the testator devised the bulk of her estate to a trustee, which would hold it in trust for her grandchildren. The trust was set to terminate when the youngest grandchild living at the time of the testator's death turned 35. The testator's son, who was disinherited, alleged that this provision of the will violated the rule against perpetuities because it created a contingent remainder pursuant to which the equitable estate might not vest until a period of time past a life in being plus 21 years. The court noted that the law favors the early vesting of an interest and that an estate will vest at the earliest possible time and will be held to vest at the death of the testator unless some later time is clearly expressed in the will. *McKibben*, 365 Ill. at 374. The court held that at the death of the testator, the immediate legal estate vested in the trustee and the immediate beneficial interest vested in the three grandchildren who were then living. *McKibben*, 365 Ill. at 375. "The deferring of the enjoyment of the principal, for reasons of the testat[or] and not for

reasons personal to the legatee or devisee, does not prevent the immediate vesting of the estate." *McKibben*, 365 Ill. at 375. Because the remainder vested at the death of the testator, the rule against perpetuities did not apply. *McKibben*, 365 Ill. at 373.

*McKibben* is distinguishable because the beneficiaries were a specific group of people, and the income beneficiaries were also the remaindermen, which supported the court's decision that the principal vested in the grandchildren when the trust was created. Furthermore, while the time for distribution in *McKibben* could be determined to a definite calendar date, the termination date of the Haskell trust was uncertain. Most important, the *Kellett* and *McKibben* courts relied on the preference for early vesting, which our supreme court later found frequently frustrates what the ordinary settlor would intend. *Beach*, 118 Ill. 2d 1.

Eliot also argues that the use of the phrase "*per stirpes*" to modify "lawful heirs" indicates that Haskell intended to keep the trust principal within her family. According to Eliot, by using the words "*per stirpes*" to modify "lawful heirs," Haskell demonstrated an intent that where a First Taker's heir did not survive to the termination date, that heir's descendants would take by representation. Otherwise, the term "*per stirpes*" is meaningless.

In support of his argument, Eliot cites *Maiorano*, 216 Va. 505, 219 S.E.2d 884. In *Maiorano*, the testator's children had a life interest in the income from the trust, which was to terminate 21 years after the death of the last survivor of his children. Upon termination of the trust, the principal was to be "divided *per stirpes* among the issue of my three children." The court found neither construction nor extrinsic evidence was necessary to ascertain the intent of the testator that the principal vested 21 years after the death of his last surviving child because the

provision that the trust would terminate 21 years after the death of the last survivor of his children was unambiguous. *Maiorano*, 216 Va. at 510, 219 S.E.2d at 888. Furthermore, refuting the argument that the principal should vest in the same manner as the income, the court held that the trust's use of the additional language "*per stirpes*" "is a clear reference to the future beyond the lives of his grandchildren, who were in being when the will was executed." *Maiorano*, 216 Va. at 511, 219 S.E.2d at 888. This manifested an intent to ensure that a portion of his estate would provide for remote descendants. *Maiorano*, 216 Va. at 511, 219 S.E.2d at 888. "It is an obvious effort to vest the principal in a different manner from the income." *Maiorano*, 216 Va. at 511, 219 S.E.2d at 888. The court found it "obvious" that the testator, by using different language in specifying the vesting of income and in directing the vesting of principal, intended different results, *i.e.*, a postponement of vesting of the principal beyond the time when the income vested. *Maiorano*, 216 Va. at 512, 219 S.E.2d at 889.

We find that Eliot demonstrated by a preponderance of the evidence that the trust vested when it terminated. Therefore, Lillian MacLennon could not bequeath an interest in the principal to NEC.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's grant of Eliot's motion for summary judgment and denial of the New England Conservatory of Music's motion.

Affirmed.

QUINN, P.J., and NEVILLE, J., concur.